**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorneys for Plaintiffs and*
*Lead Counsel for the Class*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABILENE FIREMEN'S RELIEF AND RETIREMENT FUND and THE WESTERN PA ELECTRICAL EMPLOYEES INSURANCE TRUST FUND, <br><br> Plaintiffs, <br><br> v. <br><br> WESTERN ASSET MANAGEMENT COMPANY LLC, *et al*., <br><br> Defendants. | Case No. 2:26-CV-00246-GW-ADS <br><br> <u>CLASS ACTION</u> <br><br> Hon. George H. Wu <br><br> **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# **TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS AND DEFINITIONS ........................................... vi

I.    NATURE OF THE ACTION ...................................................................1

II.   JURISDICTION AND VENUE ..............................................................7

III.  THE PARTIES .........................................................................................8

IV.   SUBSTANTIVE ALLEGATIONS ........................................................10

   A.    BACKGROUND ...............................................................................10

     1.    Principal Architects of the Scheme...................................10

     2.    Investment Vehicles at Issue.............................................11

     3.    WAMCO's Investment Strategies: Core, Core Plus,
        and Macro Opps .................................................................12

     4.    Leech's Trading Style ........................................................13

     5.    Regulatory Framework for Investment Advisers ............15

   B.    THE CHERRY-PICKING SCHEME ..............................................17

     1.    The Mechanics of Cherry-Picking....................................17

     2.    WAMCO Conceals the Scheme Even After
        It Unquestionably Has Actual Knowledge ......................18

     3.    CW Accounts Corroborate the Government's Evidence...............22

     4.    Actions Taken to Effectuate the Fraudulent Scheme ....................26

        i.    Management and Oversight of the Funds.................................27

        ii.   Trading Activities .................................................................27

        iii.  Delayed Allocations..............................................................27

ii

iv.     Performance Monitoring...............................................................28

v.      Cherry-Picking Good Trades........................................................28

vi.     Marketing and Promotion.............................................................28

vii.    False and Misleading Statements..................................................29

viii.   WAMCO's Dissemination of False Information........................29

ix.     WAMCO Turned a Blind Eye to Leech's Misconduct ............31

x.      Deferred Compensation Adjustments..........................................31

C.      EXPERT EVIDENCE PROVIDES PROOF OF THE SCHEME......32

1.      Professor Lauren Cohen's Expert Analysis Supports
        Cherry-Picking Scheme .................................................................32

        i.      First-Day Return Analysis ...........................................................33

        ii.     Allocation Timing Analysis.........................................................35

        iii.    Pre-Allocation Return Analysis...................................................36

        iv.     Price Change Analyses .................................................................37

        v.      Statistical Tests Support Prof. Cohen's FDR
                and PAR Analyses ........................................................................37

        vi.     Market Trends Do Not Explain Leech's Results.......................38

        vii.    Strategy Restrictions Did Not Constrain
                Leech's Allocations .....................................................................39

2.      Prof. Kolm's Expert Analysis Supports
        Cherry-Picking Scheme .................................................................39

        i.      Performance Analysis Results .....................................................40

        ii.     Runs Test Analysis .......................................................................41

iii

iii.   Permutation Test Analysis ...........................................42

iv.   Skewness Analysis ...................................................43

D.   WAMCO'S FALSE AND MISLEADING STATEMENTS .............44

E.   ADDITIONAL ALLEGATIONS OF SCIENTER............................50

1.   Cherry-Picking Alone Supports Scienter...................................50

2.   Leech Made False Statements Under Oath...................................50

3.   Knowing Violations of Corporate Policy Bolster Scienter ...........51

4.   Core Operations .................................................54

5.   Franklin's and WAMCO's Acceptance of Responsibility ............54

6.   Leech's Motive to Commit Fraud.....................................55

7.   Leech's Prior Bad Acts .................................................57

8.   Leech's Scienter is Imputed to WAMCO....................................59

F.   LOSS CAUSATION.................................................59

G.   CONTROL PERSON CLAIMS UNDER SECTION 20(a)...............61

1.   Defendant Leech ...................................................61

2.   Defendant Hirschmann ...............................................62

3.   Defendant Franklin .................................................62

4.   Defendant Johnson.................................................65

5.   Defendant Nicholls .................................................66

H.   PLAINTIFFS' CLASS ACTION ALLEGATIONS...........................67

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

COUNT I (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against Defendants Leech and WAMCO)....70

COUNT II (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Defendants Leech and WAMCO)................72

COUNT III (Violations of Section 20(a) of the Exchange Act Against Defendants Leech, Hirschmann, Franklin, Johnson, and Nicholls) ......................................75

PRAYER FOR RELIEF ................................................................................76

v

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF ABBREVIATIONS AND DEFINITIONS

| Abbreviation | Definition |
|---|---|
| **2021 Prospectuses** | Prospectuses for the Core Funds, filed with the SEC on April 23, 2021 |
| **2022 Prospectuses** | Prospectuses for the Core Funds, filed with the SEC on April 25, 2022 |
| **2023 Prospectuses** | Prospectus for the Core Funds, filed with the SEC on April 24, 2023 |
| **Abilene** | Abilene Firemen's Relief and Retirement Fund |
| **Amended Complaint or Complaint** | Amended Complaint for Violations of the Federal Securities Laws |
| **ATP** | Advanced Trading Platform |
| **AUM** | Assets Under Management |
| **Bellows** | John Bellows |
| **Brochure** | Form ADV Part 2A |
| **Buchanan** | Michael Buchanan |
| **CCO** | Chief Compliance Officer |
| **CEO** | Chief Executive Officer |
| **CFO** | Chief Financial Officer |
| **CIO** | Chief Investment Officer |
| **Class Period** | January 1, 2021 through November 25, 2024, both dates inclusive |
| **Core** | Western Asset US Core Bond Fund |
| **Core Funds** | Core and Core Plus |
| **Core Plus** | Western Asset Core Plus Bond Fund |
| **Credit Suisse** | Credit Suisse Group AG |
| **Criminal Case** | *USA v. Leech*, No. 24-CR-658 (GHW) (S.D.N.Y. 2024) |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| CW | Confidential Witnesses |
|---|---|
| **December 2021 ADV Brochure** | ADV Brochure filed with the SEC on or about December 15, 2021 |
| **December 2022 ADV Brochure** | ADV Brochure filed with the SEC on or about December 1, 2022 |
| **December 2023 ADV Brochure** | ADV Brochure filed with the SEC on or about December 1, 2023 |
| **Defendants** | WAMCO and Franklin, together with the Individual Defendants |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **FDR** | First-Day Return |
| **Franklin** | Franklin Resources, Inc. |
| **Fulton** | Stephen Fulton |
| **Hirschmann** | James W. Hirschmann III |
| **Individual Defendants** | Defendants Leech, Hirschmann, Johnson, and Nicholls |
| **Johnson** | Jennifer M. Johnson |
| **June 2021 ADV Brochure** | ADV Brochure filed with the SEC on June 25, 2021 |
| **June 2023 ADV Brochure** | ADV Brochure filed with the SEC on or about June 1, 2023 |
| **Leech** | Kenneth Stephen Leech II |
| **Legg Mason** | Legg Mason, Inc. |
| **Macro Opps** | Western Asset Macro Opportunities Fund |
| **Mastroianni** | Nick Mastroianni |
| **NAV** | Net Asset Value |
| **Nicholls** | Matthew Nicholls |
| **PAR** | Pre-Allocation Return |
| **Plaintiffs** | Abilene and WPEE |

vii

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| Prof. | Professor |
|---|---|
| SEC | U.S. Securities and Exchange Commission |
| SEC Action | *SEC v. Leech*, No. 1:24-cv-09017 (S.D.N.Y. Nov 25, 2024) |
| TFO | Treasury Futures and Options |
| TIPS | Treasury Inflation-Protected Securities |
| WAF | Western Asset Funds, Inc. |
| WAMCO | Western Asset Management Company LLC |
| WPEE | The Western PA Electrical Employees Insurance Trust Fund |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff, Abilene Firemen's Relief and Retirement Fund ("Abilene"), and Additional Plaintiff, The Western PA Electrical Employees Insurance Trust Fund ("WPEE"), (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their undersigned attorneys, allege in this Amended Complaint for Violations of the Federal Securities Laws (the "Complaint" or the "Amended Complaint") against Defendants (defined in Paragraph 30), the following based upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, the investigation conducted by and through their attorneys, including, among other things, a review of Defendants' public statements and/or filings made with the U.S. Securities and Exchange Commission (the "SEC"), Western Asset Funds, Inc.'s ("WAF") public statements and filings made with the SEC, filings made in *USA v. Leech*, No. 24-CR-658 (GHW) (S.D.N.Y. Nov. 25, 2024) (the "Criminal Case") and *SEC v. Leech*, No. 1:24-cv-09017 (S.D.N.Y. Nov 25, 2024) (the "SEC Action"), and wire and press releases either issued by or regarding Western Asset Management Company LLC ("WAMCO" or the "Company"), Franklin Resources, Inc. ("Franklin"), or WAF, analysts' reports, information obtained from interviews with knowledgeable former employees of WAMCO, and other information obtainable on the Internet. Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a securities class action on behalf of all persons and entities that purchased and/or otherwise acquired shares of the "Western Asset US Core Bond Fund" ("Core") and the "Western Asset Core Plus Bond Fund" ("Core Plus" and, together with Core, the "Core Funds") between January 1, 2021 and November 25, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

1

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.  The Core mutual fund classes include the Core mutual fund classes – Class I (ticker: "WATFX"), Class A (ticker: "WABAX"), Class C (ticker: "WABCX"), Class FI (ticker: "WAPIX"), Class IS (ticker: "WACSX"), and Class R (ticker: "WABRX") – and the Core Plus mutual fund classes – Class A (ticker: "WAPAX"), Class C (ticker: "WAPCX"), Class C1 (ticker: "LWCPX"), Class FI (ticker: "WACIX"), Class R (ticker: "WAPRX"), Class I (ticker: "WACPX"), and Class IS (ticker: "WAPSX").

2.     Excluded from the Class are Defendants, former and current officers, senior managers, and directors of WAMCO or Franklin, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

3.     WAMCO, a wholly owned subsidiary of Franklin, provides investment management and advisory services for fixed-income portfolios. Defendant Kenneth Stephen Leech II ("Leech") was the Chief Investment Officer ("CIO") of WAMCO, and arguably the most important and influential executive at the firm.  During the Class Period, Leech oversaw and personally implemented trading for, among other funds, WAMCO's Core Funds and the Western Asset Macro Opportunities Fund ("Macro Opps").

4.     Leech personally placed trades for U.S. Treasury Futures and Options ("TFO") positions in WAMCO's omnibus trading account, but instead of allocating them at the time of trade or immediately thereafter, Leech would wait to see whether the trade was profitable or not, then belatedly (and illegally) allocate profitable trades to the Macro Opps fund and unprofitable trades to the Core Funds. Leech engaged in a cherry-picking scheme to transfer over $600 million in net first-day gains to his favored accounts and over $600 million in net first-day losses to the disfavored Core Funds.  He did this by knowingly violating WAMCO policies

2

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

that required trades to be promptly allocated after execution. Instead, Leech routinely waited, on average, for more than 8 hours or even until the end of the trading day to observe how his trades performed before allocating gains and losses to favored and disfavored accounts.

5. Leech had at least six motives to commit this fraud, which essentially stole from one set of funds to enhance another. First, Leech's own compensation depended upon the performance of Macro Opps. Second, Leech leveraged his personal finances to Macro Opps by increasing his own investment in the fund over 100x during the Class Period, to $19 million. Third, Macro Opps generated far more revenue and profit for WAMCO for each dollar of Assets Under Management ("AUM") than the Core Funds, so it was important for Leech and WAMCO to do everything possible to enhance the performance of Macro Opps. Leech's compensation increased as WAMCO generated more fees, and Macro Opps generated almost the same amount of fees as the Core Funds despite being a fraction of their size. Fourth, whereas the Core Funds faced only an industry benchmark (a bond index), Macro Opps was marketed to meet an aggressive 10% return, far above that provided by Treasuries. Fifth, Macro Opps was considered Leech's "baby" that WAMCO said represented the best of WAMCO's ideas. Sixth, Macro Opps was far more vulnerable than the Core Funds to losing clients, and therefore AUM, because it catered to what Leech admitted was "hot money" rather than long-term investments, and because its performance lagged its published target.

6. WAMCO's and Leech's liability is beyond reasonable dispute. Leech was a management-level employee with actual authority over WAMCO. He described himself as "instrumental" to WAMCO's rise, and claimed that everyone in investment management reported to him. Leech's actions and his culpable state of mind can be imputed to WAMCO. And Leech has already been indicted for fraud in New York, and there is also a pending SEC enforcement action against

3

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

him there.  Leech also lied to the SEC under oath and falsely claimed that he made allocation decisions at the time of execution when all the evidence clearly demonstrates that he did not.

7.    Franklin and WAMCO have all but admitted Leech's fraud.  Both cooperated extensively with the Government, and WAMCO internally investigated and suspended Leech before he was even charged with any crimes.  When asked about the governmental investigations at an investor conference, Franklin's Chief Executive Officer ("CEO") said "it was one person," *i.e.*, Leech, arguably the most important person at WAMCO.  When Leech was indicted, WAMCO's initial response was to tell clients that it had made upgrades to compliance.

8.    Unlike virtually all securities fraud cases, where the automatic stay of the Private Securities Litigation Reform Act of 1995 prevents a plaintiff from obtaining internal documents and other evidence possessed by a defendant, Plaintiffs here had the benefit of reviewing the evidence filed to date in Leech's Criminal Case.  That evidence, which is based on the Government's review of over 6.5 million pages, includes emails showing that Leech considered net first-day gains and net first-day losses to be material, and emails showing he was particularly worried about the staggering losses of the favored Macro Opps fund before he embarked on the cherry-picking scheme.

9.    The evidence also shows that WAMCO's own employees quietly and internally exposed Leech's cherry-picking scheme to management before it became public.  Two of WAMCO's traders are expected to testify for the Government at trial.  Both reviewed Leech's trading data and one also conducted tests to conclude that he improperly allocated trades based on post-execution performance before the Government became involved.

10.    The Government also intends to rely on two highly qualified experts to show that it would be statistically impossible to explain Leech's scheme as anything other than fraud.  Cherry-picking is often proven with statistical evidence.

4

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

The expert reports filed in the Criminal Case demonstrate that disparate results between the Core Funds and Macro Opps were the result of the period between execution and allocation, when Leech could see price changes and allocate in response to those changes. The experts found that the difference in results between the favored funds and the disfavored funds cannot be explained by market conditions, volatility, sensitivity to interest rates, differences in sensitivity as interest rates change, or any differences in investment strategies.

11. Because Leech allocated the trades to manipulate the performance of the funds, the trades he allocated to the favored funds were exceptionally good and those to the disfavored funds were exceptionally bad. The biased results were unusually consistent over the course of the scheme, and large first-day gains were suspiciously skewed towards the favored funds while large first-day losses were especially skewed towards the disfavored funds.

12. The Government's evidence is further corroborated by the accounts of seven Confidential Witnesses ("CW") pled in this Amended Complaint. Indeed, some of these CWs saw firsthand Leech allocating trades extremely late so he could first see how the trades performed during the day. Several CWs confirm that Leech knowingly violated WAMCO policies and compliance rules in furtherance of the cherry-picking scheme. Some CW accounts demonstrate that WAMCO had a double standard whereby policies related to prompt allocations, which were principally designed to prevent cherry-picking, were regularly enforced against lower-level employees, but WAMCO turned a blind eye to Leech's choice to systematically disregard those policies. Strikingly, videotaped compliance training sessions described in filings in the Criminal Case show WAMCO's Chief Compliance Officer ("CCO") explaining that prompt allocations are necessary to avoid regulatory suspicion of the exact same misconduct that Leech engaged in for years.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

13.     WAMCO also made false and misleading statements throughout the Class Period.  WAMCO told investors that it maintained policies and established practices to avoid favoritism, unfair or inequitable allocations, and conflicts of interest between clients and WAMCO or the financial interests of its employees. None of this was true given that WAMCO's CIO (Leech) was engaged in a cherry-picking scheme to illegally benefit Macro Opps, other favored accounts, WAMCO, Franklin, and himself at the expense of the disfavored funds, Plaintiffs and the Class.  And, when reporting Net Asset Value ("NAV") to investors on a daily basis, WAMCO omitted any mention that the Core Funds' NAV had been depleted by up to $600 million or more by Leech's cherry-picking scheme, and that the scheme was a central part of the trading strategy for the Core Funds.

14.     After the cherry-picking scheme was reported internally, the findings by WAMCO whistleblowers had been raised with higher-level executives at the Company, and outside counsel had conducted an investigation, WAMCO eventually removed Leech's trading and allocation privileges from the disfavored funds no later than October 2023.  Amazingly, in December 2023, WAMCO continued to make false statements even after all this.

15.     The scheme to defraud harmed investors and caused their losses.  The undisclosed scheme artificially inflated the value of the disfavored funds overall, and Plaintiffs and the Class lost the difference between the inflated value at the time of their purchase and the true value of the disfavored funds in the absence of the scheme.  The NAV of the Core Funds began to decline during the course of the scheme as the risks started to materialize, and modestly rose when Leech was removed from the disfavored funds in October 2023.  However, the truth about the cherry-picking scheme remained concealed until governmental investigations started to bring the scheme to light.  Ultimately, a run on the disfavored funds forced the Core Funds to liquidate at lower prices and thereby further reduced the price and value of their underlying securities.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

16.     Plaintiffs also bring control person claims under Section 20(a) of the Exchange Act against Franklin, WAMCO's former CEO, and Franklin's CEO and Chief Financial Officer ("CFO").  All of these defendants had the power to exercise control over WAMCO, did exercise control over WAMCO during the Class Period, and are thus jointly and severally liable for the primary violations of Leech and WAMCO under Section 10(b) of the Exchange Act.

## II.     JURISDICTION AND VENUE

17.     Plaintiffs bring this action, on behalf of themselves and other similarly situated investors, to recover losses sustained in connection with Defendants' violations of the federal securities laws alleged herein.

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as some of the Defendants reside in this District, Defendant WAMCO is headquartered in this District and a significant portion of Defendants' business, actions, and the subsequent damages to Plaintiffs and the Class, took place within this District.

21.     In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## III.   THE PARTIES

22.   Lead Plaintiff purchased one of the mutual fund classes at an artificially inflated value during the Class Period and was damaged both by the scheme and upon the revelation of the securities law violations alleged herein. Lead Plaintiff Abilene's previously filed certification evidencing its transaction(s) in the affected mutual fund classes is hereby incorporated by reference herein. *See* ECF No. 20-3.

23.   Additional Plaintiff WPEE purchased one of the mutual fund classes at an artificially inflated value during the Class Period and was damaged both by the scheme and upon the revelation of the securities law violations alleged herein. Additional Plaintiff WPEE's previously filed certification evidencing its transaction(s) in the affected mutual fund classes is hereby incorporated by reference herein. *See* ECF No. 22-3.

24.   WAMCO is a California limited liability company, SEC-registered investment advisor, and specialist investment manager with its principal executive offices located at 385 East Colorado Blvd., Pasadena, California 91101. WAMCO's investment products include, but are not limited to, mutual, private, and closed-end funds.   WAMCO also provides investment management and advisory services for fixed-income portfolios and investment management services to institutions.   WAMCO is also contracted by registered mutual funds and private funds to manage their investment portfolios and by other investment advisers as a subadvisor.   At all relevant times, WAMCO served as a subadvisor to Non-Defendant WAF, which provides investors with a catalogue of funds, including the Core Funds.

25.   Franklin is a financial services holding company with subsidiaries operating under multiple brand names, including Franklin Templeton and WAMCO.  In July 2020, Franklin acquired Legg Mason, Inc. ("Legg Mason"), a

8

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

financial services company that was the parent entity of WAMCO.  Upon acquiring Legg Mason, Franklin became WAMCO's ultimate parent entity.

26.     Defendant Leech served as WAMCO's CIO between 1998 and 2008 and again between March 2014 and September 2023, when he became co-CIO with another WAMCO employee.  Leech served as WAMCO co-CIO until August 21, 2024, when he took a leave of absence from the Company.  Leech served as CIO of the Core Funds at all relevant times.  On November 25, 2024, Leech was indicted in the U.S. District Court for the Southern District of New York for investment advisor fraud, securities fraud, commodities fraud, commodity trading advisor fraud, and making false statements to the SEC.  On November 25, 2024, the SEC filed a parallel action against Leech in the U.S. District Court for the Southern District of New York.  Both the Criminal Case and the SEC Action relate to and substantially overlap with the cherry-picking scheme alleged herein.  The Criminal Case is currently scheduled to proceed to trial on June 15, 2026.

27.     Defendant James W. Hirschmann III ("Hirschmann") joined WAMCO in 1989 in a business development capacity and was appointed President and CEO in 1999.  Hirschmann served as WAMCO's President and CEO for over two decades, through December 2024, when he was forced to step down and transition to the role of Chairman.  Hirschmann oversaw the firm's global operations, including client relationships, business development, and overall strategic direction.  As CEO, Hirschmann was responsible for the firm's organizational structure, compliance infrastructure, and the supervision of senior investment professionals, including Leech.

28.     Defendant Jennifer M. Johnson ("Johnson") is the President and CEO of Franklin.  Johnson became CEO in February 2020 and served as CEO at all relevant times.  Johnson led the July 2020 acquisition of Legg Mason, which brought WAMCO into the Franklin organization as a wholly owned subsidiary.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

29.    Defendant Matthew Nicholls ("Nicholls") has served as Executive Vice President and CFO of Franklin since May 2019, and assumed the additional role of Chief Operating Officer ("COO") in April 2022.  As CFO and COO, Nicholls was responsible for monitoring the financial performance of Franklin Templeton's specialist investment managers, including the fee revenue, AUM, and profitability of WAMCO's investment strategies.

30.    Defendants Leech, Hirschmann, Johnson, and Nicholls are sometimes referred to herein as the "Individual Defendants."  WAMCO and Franklin, together with the Individual Defendants, are referred to herein as the "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND

#### 1.    Principal Architects of the Scheme

31.    In July 2020, Franklin acquired Legg Mason, creating one of the world's largest independent global investment managers with a combined $1.5 trillion in AUM.  WAMCO was a subsidiary of Legg Mason before the merger. After the acquisition, WAMCO became a wholly owned subsidiary of Franklin, comprising nearly a quarter of Franklin's total assets.

32.    WAMCO provides investment management and advisory services for fixed-income portfolios, discretionary services to institutional clients, and is contracted by registered mutual funds and private funds to manage their investment portfolios.  It also acts as a subadvisor to other investment advisers.  As an SEC-registered investment adviser, WAMCO owes its clients fiduciary duties, including the duty to act in good faith, provide full and fair disclosure of all material facts, and exercise reasonable care to avoid misleading clients.

33.    Leech joined WAMCO in 1990 as a portfolio manager.  He was recognized as an early leader in the field of long-duration fixed-income management and in the utilization of futures and options in broad-based bond portfolios.  Leech served as WAMCO's CIO from 1998 to 2008 and again from

10

March 2014 through September 2023.  Leech then shared CIO responsibilities with a co-CIO through August 21, 2024, when WAMCO announced that Leech was taking a leave of absence to focus on federal investigations into his conduct.

34.    As CIO, Leech led WAMCO's Investment Management Unit, which focused on the management of client portfolios.  He exercised discretion and control over WAMCO's clients' assets.  Leech also chaired WAMCO's Global Strategy Committee, headed the U.S. Broad Strategy Committee, and served as a member of the firm's Management, Asset Allocation, Global Credit, Mortgage Strategy, and Inflation committees.  He participated in weekly meetings held by each of these committees, as well as in daily strategy meetings at which Core, Core Plus, and the Macro Opps investment teams discussed and evaluated investment opportunities.  Leech advised on strategy and investment decisions for over 30 portfolios comprised of a broad cross-section of securities and other assets from the U.S. and global markets.

## 2.    Investment Vehicles at Issue

35.    A mutual fund is a type of SEC-registered investment company that pools funds from many investors and invests those funds in a combination of stocks, bonds, short-term money-market instruments, and/or other assets.  The combined securities and assets owned by a mutual fund are known collectively as the fund's portfolio. Each mutual fund share represents an investor's proportionate ownership of the fund's portfolio and of the income and capital gains the portfolio generates.  Investors purchase shares from, and sell or redeem shares to, the mutual funds themselves.  A mutual fund's portfolio is managed by an SEC-registered investment adviser like WAMCO, which owes a fiduciary duty to the fund.  The mutual fund advisory fee structure is typically based on a percentage of the AUM.

36.    A private fund is an entity that pools money from multiple investors and invests the money in various securities and other assets, but relies on exemptions from the definition of "investment company" under Section 3 of the

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Investment Company Act of 1940. Private funds are not registered with the SEC and are not subject to the Investment Company Act's regulations. However, private funds and their advisers are subject to the same prohibitions against fraud as other market participants. The private fund advisory fee structure typically includes a management fee (based on AUM) as well as a performance fee (based on the profits of the fund).

### 3.    WAMCO's Investment Strategies: Core, Core Plus, and Macro Opps

37.    WAMCO employed multiple investment strategies for its portfolios, including Core, Core Plus, and Macro Opps. The portfolio clients within these strategies included mutual funds and other registered investment companies, and private funds.

38.    The Core Funds are U.S. broad market strategies benchmarked to the Bloomberg U.S. Aggregate Index. Their goal is to generate a greater return than the Bloomberg U.S. Aggregate Index over the course of an investment cycle, while keeping benchmark-based constraints on the amount of risk that those strategies can absorb. Core Plus can use a wider range of assets than Core to accomplish that goal. WAMCO advertised the Core Funds to pension funds, large institutions, and retail investors as prudent, long-term investment strategies designed to outperform the Bloomberg U.S. Aggregate Index over a market cycle.

39.    Core had more than $44 billion in AUM across multiple portfolios, with its largest portfolio, the Core Bond Fund (Ticker: WATFX), having $31.1 billion AUM. Core Plus had more than $122 billion in AUM across multiple portfolios, with its largest portfolio, Core Plus Bond Fund (Ticker: WACPX), having $66.8 billion in AUM. At all times relevant hereto, WAMCO had between $100 and $165 billion in AUM across the Core Funds.

40.    Macro Opps was a macro-oriented, global strategy that Leech personally created in 2012. Unlike the Core Funds, Macro Opps did not adhere to

12

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

a specific industry benchmark, such as the Bloomberg Aggregate Bond Index. Instead, the stated objective of Macro Opps was to deliver returns of 10% or more annually. Because Macro Opps was not benchmarked to an outside index, its success was measured in part against its own prior "total return." WAMCO promoted Macro Opps to clients as reflecting the firm's "best ideas" and advertised that "the firm's overall value opportunities can be assessed through [the Macro Opps] strategy." Leech was Macro Opps' lead portfolio manager from inception through most of the Class Period, responsible for developing the strategy and overseeing its day-to-day operations.

41. In the beginning of the Class Period, Macro Opps had more than $13 billion in AUM across multiple portfolios. Despite Leech's efforts to prop up Macro Opps through the cherry-picking scheme, Macro Opps suffered severe investment losses in 2022 and 2023 as a result of poor trading decisions, and its AUM fell by approximately 80%. As of June 30, 2024, Macro Opps had approximately $2.1 billion in AUM. On August 21, 2024, WAMCO announced that it would close Macro Opps, and the fund was liquidated on October 29, 2024, just weeks before Leech was indicted for securities fraud.

42. In many respects, Macro Opps and the Core Funds were similar. Both traded in many of the same asset classes, including Treasuries and Treasury derivatives (futures and options, among others), investment-grade corporate bonds, high-yield bonds, and mortgage-backed securities. As a result, investment opportunities suitable for Macro Opps were frequently also suitable for Core or Core Plus. All three funds were managed by Leech, who placed trades in the same types of highly liquid Treasury derivatives across all three.

### 4.   Leech's Trading Style

43. Confidential Witness 1 ("CW1") was a Portfolio Manager at WAMCO's Pasadena office from November 2002 to October 2023, and reported to John Bellows ("Bellows"). Bellows was WAMCO's expert on Federal Reserve

13

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

policy and the head of its broad market team with responsibilities that included Core Funds portfolio management.  CW1 managed the Core Funds bond accounts and traded interest-rate products.   CW1 monitored Leech's trades through WAMCO's Advanced Trading Platform ("ATP"), an electronic trade management system, to track Leech's trades to CW1's own trading strategy.  As a result, CW1 was able to monitor Leech's trading patterns throughout the Class Period.

44.    Leech primarily traded TFOs for most of the portfolios he managed across Core, Core Plus, and Macro Opps.  According to CW1, Leech typically got into work at 4:30 a.m. Pacific Time (7:30 a.m. Eastern Time) and began trading around that time, and traded all day, generally placing dozens of trades per day. Leech also traded heavily outside normal market hours, including overnight futures markets, frequently using good-till-cancel orders that could sit overnight or longer waiting to be filled.

45.    A good-till-cancel order remains active until executed or canceled. An order is "placed" or "submitted" when the trade instruction is placed with the broker, but not "filled" until executed at the specified price, which is a gap that may span days or weeks.

46.    Leech used WAMCO's omnibus brokerage accounts at each broker with whom he placed trades.  An omnibus account allows an investment adviser to buy and sell securities and commodities on behalf of multiple clients without specifying the particular client for which a trade is intended at the time the trade is placed.  This was the case for most of the omnibus brokerage accounts that Leech relied on.

47.    Confidential Witness 2 ("CW2") worked at WAMCO's Pasadena office from January 1997 until the summer of 2023.  CW2 was the Head of International Client Service.  CW2 managed client relationships, including guiding clients on WAMCO's investment and trade allocation procedures.

14

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

48.     According to both CW2 and CW1, Leech conducted trades very differently from other portfolio managers at WAMCO.  While other portfolio managers used ATP to prepare draft trade tickets and specify allocation instructions before placing a trade, Leech did not personally record his trades into ATP or specify trade allocations in draft tickets when placing trades.  Instead, Leech predominantly placed trades by telephoning his contacts (*i.e.*, registered representatives) at brokerage firms.  Leech also relied on his handwritten notes, writing trade instructions on paper and physically handing those instructions to his trade assistant.

### 5.     Regulatory Framework for Investment Advisers

49.     Pursuant to Section 203(c) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-3(c), WAMCO is required to file Form ADV with the SEC.

50.     Part 2 of Form ADV, commonly referred to as the "Brochure," is a narrative disclosure document that WAMCO disseminates to clients and prospective clients.  WAMCO is required to produce, within 120 days of the end of the fiscal year, either an updated Brochure or a summary of material changes to each client, together with an offer to provide the full updated Brochure upon request.  17 C.F.R. § 275.204-3(b).  WAMCO is also required to amend the Brochure when any information contained therein becomes materially false or misleading.  17 C.F.R. § 275.204-1.

51.     Because investment advisers like WAMCO owe a fiduciary duty to their clients—a duty that includes an affirmative obligation to make full and fair disclosure of all material facts—the accuracy and completeness of the Brochure is of paramount importance.  The Brochure is not merely a regulatory formality; it is the mechanism through which an adviser satisfies its fiduciary disclosure obligations.

52.     Indeed, the Supreme Court recognizes that the Advisers Act "reflects a congressional recognition of the delicate fiduciary nature of an investment

15

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

advisory relationship" and that Congress intended "to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191–92 (1963) (internal quotation marks and citations omitted). The Brochure is the primary vehicle through which such conflicts are disclosed.

53. Investors thus rely on the Brochures to determine: (a) how the adviser will manage their assets; (b) what investment strategies and methods of analysis the adviser employs; (c) what conflicts of interest exist and how the adviser manages them; (d) how the adviser selects brokers and executes trades; (e) how the adviser allocates investment opportunities and trade executions among client accounts; and (f) what safeguards the adviser has in place to ensure fair treatment of all clients.

54. Disclosures regarding an investment adviser's trade allocation practices are among the most critical representations in the Brochure. When an adviser manages multiple client accounts that follow similar or overlapping strategies, the potential exists for the adviser to favor certain accounts over others in the allocation of investment opportunities. This risk is especially acute when the adviser uses omnibus trading, in which trades for multiple clients are executed in a single account and subsequently allocated among client accounts.

55. For these reasons, the SEC[1] has repeatedly emphasized the importance of fair trade allocation practices and has brought numerous enforcement actions against advisers who engaged in "cherry-picking"—the practice of allocating

---

[1] *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Investment Advisers Act Release No. IA-5248, 84 Fed. Reg. 33, 669 (July 12, 2019).

16

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

profitable trades to favored accounts and unprofitable trades to disfavored accounts after observing market movements, like Leech did here.[2]

56. For these reasons, when an investment adviser represents in its ADV Brochure that it allocates trades in a manner that is "fair and equitable" or that it maintains policies and procedures "designed to reduce the potential for favoritism," investors reasonably rely on those representations as material assurances regarding the integrity of the adviser's trade allocation process. A material misstatement or omission in these representations deprives investors of the information necessary to make informed investment decisions and to protect their own interests.

## B.   THE CHERRY-PICKING SCHEME

57. Between January 2021 and October 2023, Leech exploited his unique position as CIO, lack of enforcement by WAMCO's compliance team, and a loophole in WAMCO's trading procedures to engage in a cherry-picking scheme that preferred Leech's favored Macro Opps and disfavored the Core Funds.

### 1.   The Mechanics of Cherry-Picking

58. Cherry-picking occurs when a securities professional places orders and executes trades, but waits to allocate them until after observing whether the trades are successful in their first day, or occasionally longer. Profitable trades are disproportionately allocated to a favored account, and unprofitable trades are disproportionately allocated to a disfavored account. Over many transactions, this biased allocation effectively steals the returns from one account to benefit another account.

---

[2] The SEC has brought numerous enforcement actions against advisers who allocated trades to their own accounts and allocated less favorable or unprofitable trades to their clients' accounts. *See, e.g.*, *SEC v. Strategic Capital Management, LLC and Michael J. Breton*, Litigation Release No. 23867 (June 23, 2017) (adviser placed trades through a master brokerage account and then allocated profitable trades to a favored account while placing unprofitable trades into the client accounts in violation of fiduciary duty and contrary to disclosures).

17

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**2.   WAMCO Conceals the Scheme Even After It Unquestionably Has Actual Knowledge**

59.   Leech allocated TFOs to either Macro Opps, the Core Funds, or an even split between Macro Opps and the Core Funds.  He also allocated biased trades to specific portfolios for specific clients that the Government refers to as Account-1 and Account-2.

60.   Between 2021 and 2023, Leech took a large position in Russian debt that was nearly wiped out after the start of Russia's war with Ukraine.  He also took a large position in the Tier 1 bonds of Credit Suisse Group AG ("Credit Suisse") that became worthless when Credit Suisse collapsed in 2023.  Macro Opps was particularly impacted by these failed investments, and its AUM fell by over 80% to $3 billion as a result.

61.   That mattered because, in testimony before the SEC, Leech described Macro Opps as "hot money" that comes in and goes out "fast," with its performance judged by previous returns in prior years.  On the other hand, according to Leech's testimony before the SEC, the Core Funds had more runway to sustain losses because their investors would be disappointed in the first year, alarmed in the second year, and only then may they decide to terminate their investment in the third year.

62.   WAMCO and Leech launched a retention campaign to persuade clients to remain invested in Macro Opps on the grounds that Macro Opps recovered quickly after experiencing losses.  Leech also attempted to inflate the daily performance of Macro Opps by cumulatively allocating over $600 million in net first-day gains to Macro Opps and over $600 million in net first-day losses to the Core Funds.  He did this by waiting to see how his individual trades performed during the day before assigning winning trades to the favored Macro Opps and losing trades to the disfavored Core Funds.  According to the Government, Leech waited on average for more than 8 hours after trade execution to allocate his trades,

18

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

instead of allocating immediately as internal policy required. This delay was intended to and did give Leech a sneak peek into first-day performance, so that he could put his finger on the scale to allocate initially profitable trades to a favored fund and initially unprofitable trades to a disfavored fund.

63. In the Criminal Case, the Government has collected more than 1 million documents comprising over 6.5 million pages in discovery, including trading records contained in spreadsheets called trade blotters that show Leech's trading activity between 2019 and 2024. That data shows that Leech placed 33,000 TFO trades (futures and options that Leech traded for both the Core Funds and Macro Opps) during the Class Period. In February 2024, the Government also obtained Leech's emails and text messages through search warrants. A substantial amount of evidence has already been disclosed or discussed in the parties' filings in the Criminal Case.

64. For instance, internal emails demonstrate that Leech believed that first-day gains and first-day losses were material. On December 29, 2021, Leech explained in an email his concerns about a big negative day. In another email sent to another Macro Opps portfolio manager on March 4, 2022, Leech exclaimed that "we just need a positive number desperately!" On March 25, 2022, Leech claimed that selling call options "near the low" kept a favored fund from being "just one bad day from out of bounds."

65. In another email written to a member of the Macro Opps team on June 14, 2022, Leech stated that he was "in an extremely precarious position, [and] we can't afford to leave any basis points on the table." In addition, WAMCO calculated NAV daily, investors paid attention to NAV, and daily gains and losses contributed to the value of specific positions subscribed to or redeemed by investors on a daily basis.

66. A mutual fund's NAV is the per-share value of its portfolio, calculated by subtracting total liabilities from the total market value of assets and dividing that

19

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

figure by the number of shares outstanding.  17 C.F.R. § 270.2a-4.  NAV determines the price at which investors purchase and redeem mutual fund shares each business day.  Rule 22c-1, 17 C.F.R. § 270.22c-1, requires mutual funds to calculate their NAV at least once per business day, as of 4:00 p.m. Eastern Time, when the major U.S. exchanges close.  Because every purchase and redemption occurs at that day's NAV, any systematic distortion in a fund's portfolio value, such as the deliberate allocation of losing trades to the fund, directly and immediately reduces the price investors receive when they redeem their shares and inflates the price new investors pay upon entry.

67.  Mutual funds must also report their holdings and financial condition to the SEC—monthly on Form N-PORT pursuant to Rule 30b1-9, 17 C.F.R. § 270.30b1-9, and in annual and semi-annual shareholder reports filed on Form N-CSR pursuant to Rule 30b2-1, 17 C.F.R. § 270.30b2-1.  The cherry-picking scheme thus corrupted not only the daily share prices at which Plaintiffs and the Class transacted, but also the periodic regulatory filings—disseminated by WAMCO and Franklin—that served as the public record of the Core Funds' financial health.

68.  At trial, the Government also plans to call two WAMCO employees who quietly uncovered the cherry-picking scheme in September 2023.  The first is a Portfolio Analyst who worked on portfolios managed by Leech.  The other is a Portfolio Manager who co-managed portfolios in the Core Funds, including portfolios for which Leech was the lead portfolio manager.  The Portfolio Analyst executed trades and assisted in sizing and pre-clearing them.

69.  At Leech's trial in June 2026, the Portfolio Analyst is expected to testify that while WAMCO employees pre-cleared trades with the compliance department, Leech failed to do so.  The Portfolio Analyst sometimes sat in for Leech's Trading Assistant and allocated Leech's trades.  The Portfolio Analyst is expected to testify that Leech traded by phone all day and allocated the majority of his trades at the end of the day in violation of Company policy.

20

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

70.    After viewing Leech's trade blotter and other information in analysts' daily emails, the Portfolio Analyst learned that Leech allocated net first-day gains to favored accounts in Macro Opps, Account-1 and Account-2, and net first-day losses in the Core Funds.  The Portfolio Analyst alerted several senior officers at WAMCO who told the Portfolio Analyst that they did not want to know about Leech's biased allocations.  Then, the Portfolio Analyst extracted data about Leech's trading activity and created a spreadsheet that captured the difference between the trade price and the end-of-day price for the trades over a two-year period.  The Portfolio Analyst compared the gains and losses to the performance of others at WAMCO.

71.    The Portfolio Manager, who was a member of the Company's risk management task force, is expected to testify that Leech violated risk guardrails. Like the Portfolio Analyst, the Portfolio Manager also compared Leech's trading activity to the performance of others at WAMCO and backed up the analysis with statistical testing.  The Portfolio Manager then took those findings, together with the findings of the Portfolio Analyst, to other WAMCO executives.  Both the Portfolio Manager and the Portfolio Analyst concluded that Leech allocated trades based on post-execution performance, *i.e.*, after he had the opportunity to see how the trades performed during the day.

72.    In October 2023, WAMCO hired outside counsel to conduct an internal investigation and removed Leech's trading and allocation privileges in the Core Funds.  It did not disclose the existence of the cherry-picking scheme or the internal investigation's findings or publicly state that Leech's trading and allocation privileges had been removed from the Core Funds.  Instead, WAMCO continued to make false and misleading statements in the Brochure in December 2023 concerning its supposed lack of favoritism and fair allocation policies, and did not reimburse investors of the Core Funds to account for the money Leech had diverted by his cherry-picking scheme.  *See* Paragraphs 179 through 181.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

73. After WAMCO secretly discovered the scheme, the SEC's Los Angeles Office opened an investigation on November 6, 2023. Leech began to interact with the SEC in November 2023, but he and WAMCO again made no effort to update or correct the false statements made in the Brochure after his cherry-picking scheme was internally exposed. On February 28, 2024, the Department of Justice served search warrants on Apple Inc. and Google Inc. to obtain Leech's emails and text messages. The search warrants referred to WAMCO's internal investigation conducted by outside counsel many months earlier.

**3.    CW Accounts Corroborate the Government's Evidence**

74. Confidential Witness 3 ("CW3") was a Portfolio Manager in WAMCO's Pasadena office between March 2012 and July 2024. CW3 reported to Bellows. CW3 directed strategy and trading at WAMCO, and had a front row seat to Macro Opps from both an analytical and reporting perspective.

75. CW3 stated that Leech allocated trades well after they were executed. CW3 explained that Leech placed different orders with brokers at different times of the day, including overnight and at the beginning of the trading day. Many were filled at different points throughout the day.

76. CW3 confirmed that Leech did not have predefined allocations for his trades; none were written down at the time of trading. Instead, after Leech's trades were filled, Leech's trading assistant often chased Leech down to request allocations. CW3 knows this because CW3 worked in the same office as Leech and saw this happen on a regular basis between 2021 and 2023.

77. CW3 also corroborated that Leech did not personally enter his trades into WAMCO's ATP system, used phone calls and handwritten notes to conduct trades, and relied on his trading assistant to enter allocations. According to CW3, some of Leech's trades were allocated hours after being made. CW3 also confirmed that delayed allocations allowed Leech to see how trades performed after they were filled.

22

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

78. CW3 stated that Macro Opps was a high-frequency trading fund, could swing dramatically from day to day, and trading related to Macro Opps was focused on the short term. Accordingly, CW3 stated that short-term gains and losses for Macro Opps were more visible and impactful.

79. In addition, because Macro Opps was much smaller than the Core Funds, CW3 explained that the performance effects of allocating good trades to Macro Opps were easier to see. Meanwhile, the Core Funds were so large that individual outcomes could be diluted or hidden by their sheer size.

80. According to CW1, another Portfolio Manager at WAMCO who reported to Bellows, WAMCO utilized the ATP system to receive and monitor all trades. The ATP system allowed anyone at WAMCO to review all employees' trades, including Leech. It showed trades that were either in "draft mode," meaning they were not yet finalized or allocated, and "posted," meaning they were allocated and finalized. CW1 explained that, for electronic trades, the ATP system tracked the exact time a trade was executed. Once a trade was "executed," it was also allocated in the system. However, according to CW1, manual trades – like those utilized by Leech – did not show the exact execution time, because the "execution time" defaulted to when a trading ticket was opened, and not when the trade actually occurred. Therefore, Leech could execute a trade and wait to allocate the trade until much later without it showing up on the ATP system.

81. Like CW3, CW1 further corroborated that, while it was typical for traders to pre-clear and allocate trades beforehand through the ATP system, Leech did not do so, and instead chose to write his trade tickets on blue slips and allocate trades through the telephone. Leech physically gave handwritten instructions to WAMCO's Trade Operations staff, and they would then input his trades into the ATP system. As a result, Leech did not pre-clear his trades like all other WAMCO traders were required to do.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

82. Like CW3, CW1 also saw Leech make trades without allocating them immediately, and WAMCO's Trade Operations staff chased Leech down to allocate the trades, sometimes hours after the trades were made.

83. CW1 explained that while most WAMCO traders would be informed immediately if their trades were not instantly allocated, Leech was different because he traded overnight and then allocated the following day, with wide time gaps between execution and allocation. CW1 confirmed that Leech placed "good-until-cancelled orders," which could sit overnight or longer to be filled, and then were allocated later the next day. As such, CW1 corroborates that Leech had several hours between execution and allocation to see how the trade was performing.

84. According to CW1, Leech would use the same general strategy framework for Core, Core Plus, and Macro Opps, selling options to earn a premium, but at different degrees and exposure. CW1 corroborated that while Core had a small exposure to Russian currency in 2022, Macro Opps had a bigger exposure, and that exposure was the primary source of Macro Opps' underperformance in 2022. CW1 also confirmed that Macro Opps was invested in Credit Suisse bonds, and when the Swiss government forced Credit Suisse to merge with UBS in 2023, those bonds were valued at zero, and Macro Opps suffered a massive loss as a result. CW1 agreed that, due to the smaller size of Macro Opps, the alleged $600 million in misallocated profits due to the cherry-picking scheme would be significant, and may have accounted for Macro Opps' return for an entire year.

85. Confidential Witness 4 ("CW4") was a Quantitative Portfolio Manager at WAMCO's Pasadena office between April 2019 and May 2024. CW4 oversaw trade allocation and compliance checks for WAMCO's funds, including the Core Funds.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

86. CW4 often saw WAMCO employees stay in the office until 4:00 or 5:00 p.m. Pacific Time, waiting for Leech's trades to be allocated to Macro Opps. CW4 stated that, while allocations were meant to occur immediately after a trade, WAMCO did not strictly monitor this practice or make it a "top priority," leading to many trades being allocated hours after execution. According to CW4, allocations were timestamped by WAMCO's system, so WAMCO employees could see if a trade was allocated late, but CW4 never heard of WAMCO's compliance team ever reviewing allocation timing. As a result, CW4 stated that he was not surprised by the existence of a cherry-picking scheme at WAMCO.

87. According to CW4, Macro Opps was known as "Leech's baby." CW4 stated that Leech was more heavily involved with Macro Opps than other investment strategies at WAMCO.

88. CW4 recalled that Bellows, a Portfolio Manager at WAMCO at the time, met with Leech, Hirschmann, and Michael Buchanan ("Buchanan"), and told them that "I know something is going on." Buchanan served as Deputy CIO during the Class Period. Bellows later became WAMCO's expert on Federal Reserve policy and head of its broad market team with responsibilities that included Core Funds portfolio management. CW4 confirms that Bellows abruptly left WAMCO in May 2024, mere months before Leech was indicted, and after Hirschmann "gave [Bellows] the middle finger." CW4 also stated that WAMCO employees were "very sure" Bellows became the whistleblower. CW1 further verified that Bellows and a Portfolio Analyst, Nick Mastroianni ("Mastroianni"), attempted to replicate Leech's trading strategy and were unable to do so. On information and belief, and based on CW4's and CW1's accounts, Plaintiffs allege that Bellows and Mastroianni are the individuals who uncovered and reported Leech's cherry-picking scheme and are expected to testify in the Criminal Case.

89. Confidential Witness 5 ("CW5") was a Client Solutions Specialist in WAMCO's Pasadena office from September 2011 to August 2021. CW5 reported

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to Chief Risk Officers Tim Winston, and later Ahmet Kocagil, who in turn reported to WAMCO's COO. CW5 managed customized investment portfolios for WAMCO's insurance clients.

90. According to CW5, it was well known at WAMCO that Macro Opps had a unique strategy to sell volatility. CW5 explained that Macro Opps' main option writing strategy was to sell short-dated options. CW5 stated that short-dated options lose value quickly as time passes, and that loss in value flows to the trader as profit. Through this strategy, there is a high likelihood of success during the first few days after a trade, but the strategy also carries a significant amount of risk if there is a significant shift in the overall market. CW5 affirmed that the Core Funds did not utilize the short-dated option-selling strategy. Accordingly, CW5 explained, Macro Opps had a much higher risk exposure than the Core Funds. CW5 explained that the Core Funds had significantly higher AUM than Macro Opps, and thus returns from the Core Funds could be allocated to a different fund without being noticed.

91. WAMCO employed Confidential Witness 6 ("CW6") from September 2019 to June 2022. CW6 worked out of WAMCO's Pasadena, California office, and served as a Supervisor in Trade Operations. CW6 handled trades after execution and allocation.

92. CW6 confirmed that WAMCO utilized the internal ATP system, and that WAMCO's trades would flow through the ATP system, and recorded timing data for all trades. However, according to CW6, Leech did not personally enter his trades into the ATP system, and instead worked with a trading assistant to manually enter them.

### 4. Actions Taken to Effectuate the Fraudulent Scheme

93. In furtherance of the scheme to defraud investors, Leech and WAMCO took the following actions:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

### i.  Management and Oversight of the Funds

94.    As CIO of WAMCO, Leech oversaw and advised on strategy and investment decisions for WAMCO's portfolios.  Specifically, Leech managed and directed investments for Macro Opps and the Core Funds.  According to the Government,  Leech also participated in strategy meetings where the Core Funds and Macro Opps investment teams often discussed and evaluated investment opportunities.  These activities helped Leech exert control over the investments in Macro Opps and the Core Funds, so that he could effectively cherry-pick favorable trades for Macro Opps.

### ii.  Trading Activities

95.    Leech did not place trades electronically through ATP like other WAMCO traders, and instead used "blue slip" trading tickets or called brokers directly.  He started trading at approximately 5:00 a.m. Pacific Time,  and utilized an omnibus account to trade on behalf of multiple clients.  Leech often placed "good-until-cancelled" orders at the end of the day that would be filled sometimes during the evening.  He also often placed multiple trades in the same direction (*i.e.*, buy or sell), using the same instrument (*e.g.*, five-year Treasury futures), but placed them at different times and at different prices.  This allowed Leech to vary the performance of his trades, allocating gains (or smaller losses) to Macro Opps and losses (or smaller gains) to the Core Funds.  These trading activities allowed Leech to accumulate a significant number of trades that he could then pick and choose from when he finally decided to allocate his trades.

### iii.  Delayed Allocations

96.    During the scheme, Leech did not allocate trades at the time they were placed.  Instead, he waited until the end of the day to allocate his trades.  On other occasions, he instructed his employees to wait on his allocations at the beginning of the following day.  This allowed Leech additional time to monitor how a trade performed before any decision to allocate was made.

27

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

#### iv.     Performance Monitoring

97.     Leech arrived daily at WAMCO offices at approximately 4:30 a.m. Pacific Time and then monitored how his trades performed throughout the day by viewing a Bloomberg terminal.  This allowed Leech to learn which trades performed well and which did not, so that he could allocate the best-performing trades to Macro Opps.

#### v.      Cherry-Picking Good Trades

98.     Once Leech observed the performance of his trades for several hours and identified the trades with the better first-day gains, he then strategically allocated better-performing trades to Macro Opps and worse-performing trades to the Core Funds.  He did this by either emailing or calling his trading assistant late in the day and directing his trading assistant to allocate multiple trades at once pursuant to his specific instructions.  During the Class Period, Leech specifically allocated trades with net first-day gains of over $600 million to Macro Opps, and allocated trades with net first-day losses of over $600 million to the Core Funds.

#### vi.     Marketing and Promotion

99.     WAMCO actively promoted to investors Macro Opps and the Core Funds, as well as Leech's trading skills.  For example, WAMCO told investors that Leech and other traders "source[d] their ideas for [WAMCO's] vast global platform[.]"  WAMCO also marketed the Core Funds and Macro Opps through the dissemination of Prospectuses, the Brochure, and other presentations.

100.    Leech also personally communicated with investors via WAMCO's Market Commentary section that was published on WAMCO's website.  For example, in a May 2022 Market Commentary, Leech told investors that "[i]t's during times like this when [WAMCO] has benefited the most.  Adhering to our fundamental, relative value discipline, we recognize that opportunities are created when apprehension and concern drive valuations well beyond fair value."  The

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Market Commentary was designed to position Leech as a thought leader and someone who investors should trust with their money.

### vii.    False and Misleading Statements

101.    As outlined in Section IV(D), WAMCO made false and misleading statements to investors during the Class Period.  Specifically, WAMCO claimed that it did not favor one fund over another and allocated trades fairly and equitably when it did the exact opposite, and routinely allowed Leech to flout WAMCO's trading and compliance rules.

### viii.    WAMCO's Dissemination of False Information

102.    WAMCO directed investors, through its website, to Prospectuses for Core and Core Plus filed by WAF.  While the Prospectuses for the Core Funds were signed by WAF's directors and made by WAF, WAMCO disseminated them to clients and the public throughout the Class Period.  WAMCO is thus liable for the false and misleading statements made by WAF that WAMCO disseminated.  The 2021 Prospectuses for Core and Core Plus, filed with the SEC on April 23, 2021 (the "2021 Prospectuses") stated:

> Portfolio management risk.  The value of your investment may decrease if the subadvisers' judgment about the quality, relative yield, value or market trends affecting a particular security, industry, sector or region, or about interest rates, is incorrect or does not produce the desired results, or if there are imperfections, errors or limitations in the models, tools and data used by the subadvisers.  ***In addition, the fund's investment strategies or policies may change from time to time.  Those changes may not lead to the results intended by the subadvisers and could have an adverse effect on the value or performance of the fund.***

103.    The statements identified in Paragraph 102 above were materially false and/or misleading when made because Leech was already engaged in an ongoing cherry-picking scheme to defraud investors, which constituted an undisclosed change in strategy and policy, and that change was already having an adverse effect on the Core Funds' value and performance as Leech systematically

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

allocated losses to the Core Funds and gains to Macro Opps, Account-1, and Account-2.

104.    The 2021 Prospectuses further misled investors by assuring them that the advisers for the Core Funds would exercise "prudent investment management" and seek to "maximize total return."

105.    The statements identified in Paragraph 104 above were materially false and/or misleading when made because the ongoing cherry-picking scheme was anything but "prudent investment management" and was intended to, and did, maximize investors' losses in the Core Funds.

106.    On April 25, 2022, WAF filed the Prospectuses for Core and Core Plus (the "2022 Prospectuses"), in which it made similar misrepresentations identified in Paragraphs 102 and 104, and which were false and misleading for the same reasons identified in Paragraphs 103 and 105.  Through its website, WAMCO directed investors to the 2022 Prospectuses.

107.    On April 24, 2023, WAF filed the 2023 Prospectuses for Core and Core Plus (the "2023 Prospectuses"), in which it made similar misrepresentations identified in Paragraphs 102 and 104, and which were false and misleading for the same reasons identified in Paragraphs 103 and 105.  Through its website, WAMCO directed investors to the 2023 Prospectuses.

108.    WAMCO's dissemination of WAF's misstatements was designed to, and did, falsely reassure investors that their investments were fairly managed, and WAMCO's dissemination of the misleading Prospectuses was an act that operated as a fraud on Plaintiffs and the Class.

109.    In addition, through its website, WAMCO directed investors to semi-annual and annual reports filed by WAF on Form N-CSR.  The NAV for each of the mutual fund classes of the Core Funds was reported on each version of the Form N-CSR filed with the SEC during the Class Period.  The NAV figures on each of the Form N-CSRs were materially false and misleading when made because, by

30

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

allocating losses to the Core Funds and depriving them of gains during the Class Period, Leech degraded the overall value, *i.e.*, the NAV of the Core Funds between January 2021 and October 2023, even if the portfolios still remained artificially inflated because WAMCO continued to conceal the cherry-picking scheme for over another year.

### ix.      WAMCO Turned a Blind Eye to Leech's Misconduct

110.   As discussed in Section IV(E)(3), WAMCO had stringent trading and compliance procedures for its traders, mandating that all trades must be allocated shortly after they are completed.  WAMCO, however, knew that Leech did not follow Company policy.  According to CW1, CW2, CW3, and CW7, Leech's failure to follow trading and compliance policies was well known at WAMCO.

111.   According to CW4, even after Bellows raised concerns about Leech's trading patterns, Hirschmann and co-CIO Buchanan dismissed those concerns.

### x.      Deferred Compensation Adjustments

112.  Between January and March 2023, Leech reduced his personal exposure via deferred compensation[3] from the Core Funds from approximately $19.4 million to approximately $5.6 million, and reduced it further to approximately $143,000 by August 2023.  Conversely, in March 2023, Leech increased his personal investment in Macro Opps from $142,000 to $19 million.  Accordingly, Leech directed his personal compensation so that he would derive personal benefits from his cherry-picking scheme and avoid exposure to the unprofitable trades he was allocating to the Core Funds.

---

[3] "Deferred compensation" is a structure where portfolio managers will defer a percentage of their compensation over a longer period of time, and link that compensation to the performance of their investments.  This incentivizes portfolio managers to improve performance of the fund as greater long-term success equals greater deferred compensation.

31

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## C.    EXPERT EVIDENCE PROVIDES PROOF OF THE SCHEME

113.   Cherry-picking schemes are generally difficult to detect, and proof of their existence often requires drawing inferences from trading data and irregularities in trading practices.  As such, parties often rely on statistical evidence to establish liability.  Signed expert disclosures submitted by two highly qualified experts in Leech's Criminal Case demonstrate that Leech systematically directed winning trades to Macro Opps and losing trades to the Core Funds.  To form their conclusions, the Government's experts relied on trading blotters and other pertinent data produced by WAMCO.  Both experts are prepared to testify at Leech's trial scheduled for June 2026.

### 1.    Professor Lauren Cohen's Expert Analysis Supports Cherry-Picking Scheme

114.   Professor ("Prof.") Lauren Cohen is a professor of finance and entrepreneurial management at Harvard Business School.  He researches and teaches asset pricing and portfolio and mutual-fund management.  He has authored numerous peer-reviewed papers on empirical asset pricing and trading behavior.

115.   Prof. Cohen examined Leech's trades at WAMCO during the Class Period.  He also analyzed broker records to determine the times Leech placed trades and when those trades were filled.

116.   For the mutual funds at issue, Leech frequently bought and sold TFOs.  Futures are obligations to buy or sell a specified amount of the underlying asset on a set future date.  Options are the right, but not the obligation, to buy or sell at a set price on a set future date.  Based on data from WAMCO's trade blotter, Prof. Cohen identified four types of allocations: (a) Core Funds reflected by a command of "SKL" or "SKL1"; (b) Macro Opps reflected by a command of "Macro Opps" or "MO"; (c) a 50/50 split between the Core Funds and Macro Opps; and (d) specific client accounts.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

117. Leech typically placed between 10 and 20 TFO trades per day, amounting to thousands of trades over the relevant period. Leech placed TFO trades through several different brokers, including Goldman Sachs, Jefferies, Morgan Stanley, R.J. O'Brien, RBC Capital Markets, Marex, and Wells Fargo. Leech had a default rule that trades placed through the broker Marex should be allocated to Macro Opps. Consistent with such a rule, nearly all of the trades Leech placed through Marex were allocated to Macro Opps. The Marex trades thus serve as a critical control group: they went to Macro Opps automatically, without Leech exercising allocation discretion.

118. Prof. Cohen conducted multiple other analyses to support his conclusions, including (a) First-Day Return Analysis, (b) an Allocation Timing Analysis, (c) a Pre-Allocation Return ("PAR") Analysis, and (d) a Price Change Analysis Around Fill and Allocation.

**i.      First-Day Return Analysis**

119. Prof. Cohen first analyzed the first-day returns ("FDR") of Leech's TFO trades using the trade size, the price at which Leech made the trade, and the daily settlement price. An FDR captures how a trade performed on the first day, between the time Leech placed the trade and the CME settlement time. In plain terms, an FDR measures whether a trade made or lost money by day's end. FDRs are important for three reasons: (a) they contribute to the overall performance of the account to which a trade is allocated; (b) they reflect whether Leech entered a position at a favorable price; and, (c) because Leech had the practice of allocating trades toward the end of the day, the FDR was information he had access to when making his allocation decisions.

120. Prof. Cohen analyzed 13,430 TFO trades Leech placed between January 1, 2021 and October 19, 2023. Of those, approximately 2,127 were allocated specifically to the Core Funds; approximately 5,331 were allocated specifically to Macro Opps (of which approximately 2,600 were Marex trades); and

33

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

approximately 5,337 were split between the Core Funds and Macro Opps (largely 50/50).

121. Prof. Cohen concluded that the results were unremarkable when the 13,430 TFOs were viewed together. The average FDR across all trades was approximately -$6,000, and the net FDR across all trades was approximately -$86 million.

122. But Prof. Cohen found that the TFOs Leech allocated specifically to the Core Funds had an average FDR of approximately -$309,000 and a net FDR of -$659 million.

123. Similarly, the TFOs Leech allocated 50/50 between the Core Funds and Macro Opps had an average FDR of approximately -$15,000 and a net FDR of -$79 million. In addition, the TFOs automatically allocated through Marex had an average FDR of -$7,000 and a net FDR of -$19 million. After October 20, 2023, when Leech was no longer allowed to allocate trades to the Core Funds, the FDRs of his Macro Opps trades (excluding Marex) did not have a pronounced skew (average approximately $7,000; net $3 million).

124. On the other hand, the FDRs of trades Leech allocated specifically to Macro Opps (excluding the Marex trades) had an average FDR of approximately $243,000 and a net FDR of $664 million.

125. According to Prof. Cohen, the sharp divergence in gains and losses appeared only when Leech had discretion to choose between Macro Opps and the Core Funds. When that discretion was absent, because trades were split 50/50, went to Macro Opps automatically through Marex, or were made after Leech was forbidden to trade for the Core Funds, the FDRs were normally distributed around zero.

126. Prof. Cohen confirmed that the difference in results could not be explained by the type of trading instrument, the size of the trade, or timing.

34

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

127.    However, Prof. Cohen's analysis found a strong, direct relationship between the size of a trade's FDR and where Leech allocated it.  Looking only at trades allocated to Macro Opps (excluding Marex) and the Core Funds, approximately 56% of trades were allocated to Macro Opps overall, but 76% of trades with FDRs between $50,001 and $100,000 went to Macro Opps; 88% between $300,001 and $500,000; 95% between $750,001 and $1,000,000; and 98% of trades with FDRs over $1,000,000.  The pattern is perfectly inverted for losses: of trades with FDR losses exceeding -$1,000,000, 97% went to the Core Funds. The bigger the winner, the more likely Leech allocated it to Macro Opps; the bigger the loser, the more likely he allocated it to the Core Funds.

### ii.    Allocation Timing Analysis

128.    If directions to allocate are given at the time orders are placed, there is little opportunity for market performance to influence the decision.  But if a trader waits for a meaningful amount of time, the performance of the trade can be seen and taken into consideration.  Prof. Cohen found that Leech had a significant amount of time to observe how the trades performed before deciding where to allocate them.

129.    According to information Prof. Cohen considered, Leech typically placed orders throughout the day, with his trade volume highest between 5:00 a.m. and 7:00 a.m. Pacific Time.  However, Leech's trades were typically recorded as allocated in the early afternoon, with most allocations occurring between 12:00 p.m. and 3:00 p.m. Pacific Time and the highest volume between 1:00 p.m. and 2:00 p.m. Pacific Time, which is at the end of a trading day.  With the exception of trades placed through Marex by default, the average time between fill and recorded allocation was over 8 hours, and the median was approximately 6.7 hours. Approximately 86% of Leech's trades were not allocated within 2 hours of fill, and approximately 65% were not allocated within 5 hours.  This pattern held regardless

35

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of whether Leech was allocating futures or options, or whether he was allocating to Macro Opps, the Core Funds, or 50/50.

### iii.    Pre-Allocation Return Analysis

130.   Prof. Cohen also conducted a PAR analysis on Leech's TFOs.  A PAR analysis shows how much each trade gains or loses between the time it is filled and the time it is allocated.  If a trader allocates based on information at the time of allocation, a divergence in PAR appears rather than in post-allocation returns.

131.   Prof. Cohen's PAR analysis found an even more pronounced divergence than his FDR analysis.  The PARs were unremarkable for all trades as a whole with an average PAR of approximately -$13,000 and a net PAR of approximately -$174 million.  But trades allocated to the Core Funds lost, on average, approximately $330,000 each during the hours before allocation, totaling approximately $701 million in losses.  The trades allocated to Macro Opps gained approximately $260,000 on average, with a PAR of $701 million.  Tellingly, the PARs for trades where Leech lacked discretion, such as the 50/50 trades and Marex trades, were evenly distributed around $0, just like his overall trades.

132.   Prof. Cohen's analysis also showed that, on any given day, the single best-performing trade was allocated to Macro Opps 83% of the time and to the Core Funds only 17% of the time.  Conversely, the single worst-performing trade was allocated to the Core Funds 73% of the time and to Macro Opps only 27% of the time.

133.   Prof. Cohen performed regression analyses to determine what factors best predicted Leech's allocation decisions between Macro Opps and the Core Funds.  Regression analysis is a statistical method that tests multiple possible explanations for a pattern of behavior to determine which one best explains it, like a process of elimination that identifies the real driving force behind a set of decisions. He tested pre-allocation profitability (both as a binary gain/loss variable and as a continuous dollar amount), trade size, trade convexity, time-to-maturity,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

interest rate movements prior to trade, derivative type/tenor/side, and broker. The results showed that the pre-allocation profitability of a trade, whether it was measured as a binary or continuous variable, was the single best predictor of Leech's allocation decisions, far exceeding the predictive ability of any other factor. Trade size, convexity, time-to-maturity, pre-trade interest rate changes, derivative type, and broker each explained little of Leech's decisions. Combining all other factors with pre-allocation profitability did not materially improve explanatory power beyond pre-allocation profitability alone. The relationship between pre-allocation profitability and allocation grew even stronger among trades with large gains or losses.

### iv.     Price Change Analyses

134. Prof. Cohen conducted a Price Change Analysis based on timing: 24 hours before the trade, at the time of allocation, and up to 24 hours after allocation. Prof. Cohen found that, 24 hours before trading, there was a high degree of similarity in how prices changed regardless of how Leech later allocated. During the time between fill and allocation, the prices of Macro Opps trades moved sharply in the opposite direction from the Core Funds trades, with price movements benefiting Macro Opps and going against the Core Funds. During the 24 hours after allocation, prices again showed a high degree of similarity regardless of allocation. The difference in performance appeared only during the window when Leech could observe returns but had not yet allocated, and disappeared both before and after that window.

### v.     Statistical Tests Support Prof. Cohen's FDR and PAR Analyses

135. Prof. Cohen performed various statistical tests on FDRs and PARs to determine whether the returns for Macro Opps trades and the Core Funds trades were drawn from the same pool or from fundamentally different distributions.

37

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

136.   The results proved that the difference in PARs between Macro Opps (excluding Marex) and the Core Funds was statistically significant across all TFOs, including futures alone, options alone, and within each tenor, broken down by buys and sells.   When the same tests were applied to returns in the 24 hours after allocation, the difference between Macro Opps and the Core Funds showed weak statistical significance, often indistinguishable from noise.   The same pattern held across every control comparison: Macro Opps vs. Marex, Macro Opps vs. 50/50, and Core Funds vs. 50/50 distributions.   Returns in the 24 hours before trading showed that Macro Opps and Core Fund trades were statistically indistinguishable before Leech traded.   The statistical differences appeared only in the post-trade, pre-allocation window.

### vi.   Market Trends Do Not Explain Leech's Results

137.   Prof. Cohen found that changes in volatility and yield between 2021 and 2023 did not explain the difference in results.   While volatility increased, an increase in price variability did not explain the consistent pattern of positive Macro Opps returns and negative Core Funds returns.   Similarly, Treasury yields broadly rose between 2021 and 2023, but that did not explain the pattern either.

138.   Regression and autocorrelation tests Prof. Cohen performed also showed that interest rate movements were largely unpredictable in this timeframe, consistent with academic literature findings that short-term interest rate changes are difficult to predict reliably.   Thus, even if Leech traded in reaction to market signals, there was no reason why his trades would consistently generate positive PARs for Macro Opps and negative PARs for the Core Funds.   According to Prof. Cohen, academic literature further shows that persistence in active management performance is quite rare: in liquid markets, the probability of a fund outperforming over a 5-year period is roughly 21%, and over a 20-year period, roughly 7%.

38

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**vii.      Strategy Restrictions Did Not Constrain Leech's Allocations**

139.   Duration is a measure of how sensitive a bond portfolio is to changes in interest rates.  The higher the duration, the more the portfolio's value will move when rates change.  Investment funds often set duration limits to control risk.  Prof. Cohen found that while Core, Core Plus, and Macro Opps had different duration restrictions, those restrictions did not meaningfully constrain Leech's allocation decisions.  Each individual trade had only a negligible effect on portfolio duration, and counterfactual analyses confirmed that even if Leech had split every trade equally between the Core Funds and Macro Opps, or reversed all of his allocations entirely, each portfolio's duration would have remained virtually unchanged, with correlations to actual duration ranging from 0.96 to over 0.99.  In other words, duration limits gave Leech no legitimate reason to favor one fund over another when allocating trades.

140.   Across Macro Opps and the Core Funds, Leech traded the same types of instruments in the same ways.  For example, he tended to sell options more than buy them, sold more call options than bought put options, and traded futures in similar proportions.  Accordingly, as Prof. Cohen's statistical analysis confirmed, the stark first-day performance deviations could not be attributable to different trading strategies.

**2.      Prof. Kolm's Expert Analysis Supports Cherry-Picking Scheme**

141. Prof. Petter Kolm is another expert prepared to testify for the Government at Leech's trial.  He is a Professor of Mathematics and the Director of the Mathematics in Finance M.S. Program at New York University's Courant Institute of Mathematical Sciences.  Prof. Kolm has extensive knowledge of financial mathematics, including its applications to investment management, portfolio optimization, trading strategies, portfolio and risk management, and

39

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

evaluating trader performance.  In addition to his academic work, Prof. Kolm has designed trading strategies, including for fixed-income portfolios.

142.   Prof. Kolm relied on: (1) trade blotters showing Leech's trades; (2) WAMCO's historical portfolio information, such as gross returns, AUM, duration, and convexity; (3) records from brokers; and (4) data from the CME reflecting yield levels and information about bids, offers, and trades for different TFOs.

### i.        Performance Analysis Results

143.   Prof. Kolm performed several tests to determine whether the difference in results between Macro Opps and the Core Funds could be explained by Leech's trading skills.  He examined returns after adjusting them for volatility, returns earned per unit of risk taken, and the historical returns of certain benchmarks to evaluate performance.

144.   All three methods showed that Leech's FDRs for TFO trades allocated to Macro Opps were abnormally good, and his FDRs for trades allocated to the Core Funds were abnormally poor.

145.   Prof. Kolm used standard financial models to measure whether Leech's FDRs reflected genuine skill.   These models compare a trader's performance against a benchmark, here, the Bloomberg Aggregate Index, which tracks the overall U.S. bond market, to determine whether the trader is adding value beyond what the market itself delivers.  The results were striking.  Leech's FDRs for Macro Opps consistently beat the benchmark by a wide margin, and those returns did not move in sync with the broader bond market, meaning the gains were not simply a product of market conditions.  For the Core Funds, the opposite was true: Leech's FDRs consistently fell below the benchmark.  Yet when Prof. Kolm looked at the overall daily performance of Macro Opps and the Core Funds, inclusive of all assets and different traders, both tracked the broader bond market normally, with no evidence of unusually good or bad performance.  In other words,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the abnormal results were isolated to Leech's FDRs on the trades he chose to allocate.

146.    When Leech's Macro Opps FDRs were compared directly to the FDRs for the Core Funds, the two moved in opposite directions: when Macro Opps had a good first day, the Core Funds had a bad one, and vice versa.  This seesaw pattern is exactly what one expects to see when a cherry-picking scheme is afoot.  By contrast, the overall daily performance of Macro Opps and the Core Funds moved together in the same direction, as one would expect of two strategies investing in the same broad asset class.  The opposite-direction pattern appeared only in Leech's FDRs, the one metric he could influence through his allocation decisions.

147.    Prof. Kolm also compared the risk-adjusted performance of Leech's FDRs against a wide universe of other benchmarks.  Using both volatility-adjusted returns and returns earned per unit of risk taken, the FDRs for Macro Opps were significantly higher than every comparator, while those for the Core Funds were significantly lower than every comparator.  Yet the overall daily performance of Macro Opps and the Core Funds was indistinguishable from comparable funds and the Bloomberg Aggregate Index.  The abnormality was confined entirely to Leech's allocation decisions, which distributed first-day gains and losses between Macro Opps, Core, and Core Plus.

### ii.    Runs Test Analysis

148.    A runs test is a statistical method that examines whether a sequence of outcomes is random or exhibits unusual clustering.  A "run" is a streak where one outcome occurs one or more times consecutively.  If a sequence has far fewer alternations between outcomes than expected, that suggests the sequence is not random but that something is causing outcomes to cluster.  Prof. Kolm used runs tests to examine whether the pattern of positive and negative FDRs in Leech's trades was random or exhibited suspicious clustering.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

149.   For Leech's overall TFO trades, there were 331 runs (approximately 344 expected), with 380 positive FDR days and 307 negative FDR days.  For 50/50 trades, 322 runs (335 expected).  For Marex trades, 321 runs (310 expected).  For post-October 2023 trades, 49 runs (58 expected).

150.   However, for Macro Opps trades, the runs test showed only 77 runs when approximately 280 were expected, with 518 positive FDR days and only 40 negative FDR days.   For the Core Funds, there were only 102 runs when approximately 252 were expected, with 438 negative FDR days and only 64 positive FDR days.  These results reflect an extraordinary level of consistency that is highly improbable for a trader operating in a market where short-term price changes were largely unpredictable.

151.   The comparative runs test examining Macro Opps FDRs against the Core Funds FDRs also showed only 17 runs when approximately 190 were expected, with 369 days where Macro Opps had positive FDRs and Core Funds had negative FDRs, and only 8 days of the reverse.  Leech almost never had a day where Macro Opps lost on the first day while the Core Funds gained, which is a statistically implausible result under proper allocation.

152.   When the same comparative analysis was applied to returns in the 24 hours after allocation, Macro Opps did not outperform the Core Funds for unusually long stretches.  There were 150 runs (148 expected), with 148 days favoring Macro Opps and 146 favoring the Core Funds, which is perfectly consistent with random chance.  The unusual clustering disappeared once Leech's allocation decisions were already made.

### iii.    Permutation Test Analysis

153.   A permutation test evaluates a hypothesis by randomly reshuffling data to generate reference distributions.  Prof. Kolm took the exact same trades Leech actually made and randomly reassigned which trades went to Macro Opps, the Core Funds, or to accounts split 50/50.  He reshuffled the data 100,000 times to

42

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

generate the full range of outcomes. For each trading day, the number of trades in each category remained the same; only the assignment of specific trades to categories changed.

154. In 100,000 permutations, the FDRs of Macro Opps ranged between approximately -$100 million and $200 million. The actual FDRs of TFOs Leech allocated to Macro Opps were over $600 million, three times higher than anything random reshuffling produced. In 100,000 permutations, the FDRs of the Core Funds ranged between approximately -$200 million and zero. The actual FDRs were over $600 million in losses, or three times more negative than anything the random reshufflings produced. In 100,000 permutations, the difference in FDRs between Macro Opps and Core Funds generally ranged between approximately $0 and $300 million. The actual difference was well over $1 billion, again more than three times the maximum difference produced by random reshuffling.

155. In contrast, the returns in the 24 hours after allocation for both Macro Opps and the Core Funds, and the difference between them, fell comfortably within the range of the 100,000 permutation outcomes. After allocation decisions were already made, the performance of Macro Opps and the Core Funds was consistent with random chance.

#### iv.    Skewness Analysis

156. Skewness is a statistical metric that measures the asymmetry of a distribution. Positive skewness means a distribution has more extreme positive values than expected; negative skewness means more extreme negative values. Prof. Kolm expected, based on academic literature and trading experience, that the FDRs of Leech's TFO trades would be close to a normal distribution. Consistent with that expectation, the FDRs of Leech's trades overall, his 50/50 trades, his Marex trades, his post-October 2023 trades, and the performance of his trades in the 24 hours after allocation were all close to normally distributed.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

157.  In contrast, the skew of FDRs for Macro Opps trades was significantly positive, and the skew for the Core Funds trades was significantly negative.  As the FDRs of Leech's trades grew, a higher percentage went to Macro Opps: about 91% of trades with FDRs greater than $250,000 went to Macro Opps instead of the Core Funds.  Conversely, about 92% of trades with FDR losses greater than $250,000 went to the Core Funds.  The top 10% of Macro Opps trades by FDR accounted for approximately half of the cumulative Macro Opps FDRs, and the bottom 10% of the Core Funds trades accounted for approximately half of the cumulative Core Funds FDRs.

### D.    WAMCO'S FALSE AND MISLEADING STATEMENTS[4]

158.  On June 25, 2021, and continuing throughout the Class Period, WAMCO filed an ADV Brochure ("June 2021 ADV Brochure") with the SEC and all relevant state authorities.  In the June 2021 ADV Brochure, WAMCO stated as follows:

> Western Asset maintains fee schedules for different strategies, some of which may involve performance fees or other customized fee arrangements.  In addition, Western Asset may agree to specific performance fees or other fee arrangements upon client request.  Such performance fee-based accounts are managed alongside accounts that have a more traditional fee structure (*e.g.*, accounts that pay solely asset-based fees), typically by the same portfolio manager or team.  This arrangement inherently creates a conflict of interest as Western Asset has an incentive to favor performance-based fee accounts in order to increase its revenues.  Moreover, in situations where Western Asset is paid a performance fee, it may have an economic incentive to make riskier investments and/or pursue riskier strategies than it otherwise would.  There are other potential conflicts that arise from the management of accounts with conflicting investment strategies and accounts in which Western Asset has a proprietary interest.  ***These***

---

[4] Unless otherwise noted, all emphasis in this section is added. Where larger quotations were necessary to provide context and meaning to the alleged misstatements, Plaintiffs have bolded and italicized the materially false and misleading parts of the statements identified.

44

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*conflicts could cause Western Asset to favor particular accounts with different strategies or allocate investments to accounts in which it has a significant ownership or financial interest ("proprietary accounts"). Western Asset seeks to mitigate this conflict through a variety of means.*

159. The statements identified in Paragraph 158 were materially false and misleading when made because (1) Leech was already engaged in a cherry-picking scheme to favor Macro Opps, Account-1, and Account-2 and disfavor the Core Funds before these statements were made, (2) Leech and WAMCO were motivated to maintain the cherry-picking scheme to generate more revenue and extract more fees, *infra* at Section IV(E)(6), and as a result, (3) Leech and WAMCO (a) illegally favored Macro Opps, Account-1, and Account-2 at the time, (b) allocated gains to those accounts unfairly because of their own financial incentives, and (c) failed to mitigate the harmful effects of Leech's cherry-picking scheme because Leech knowingly violated WAMCO policies and his knowing violations were well-known throughout the Company.

160. In the June 2021 ADV Brochure, WAMCO further assured investors that it maintained "*policies and practices that are designed to reduce the potential for favoritism*." Specifically, WAMCO claimed that:

*Second, Western Asset maintains compliance policies and procedures that it believes are reasonably designed to result in fair allocations of investment opportunities to clients over time, even though a specific trade allocation may have the effect of benefiting one or more accounts over other accounts when viewed in isolation.* Western Asset frequently bunches (or aggregates) orders to minimize execution costs and optimize the implementation of investment strategies for clients.

161. The statements identified in Paragraph 160 were materially false and misleading when made because (1) Leech was already engaged in a cherry-picking scheme to favor Macro Opps, Account-1, and Account-2 and disfavor the Core Funds before these statements were made, (2) Leech unfairly allocated losses to the

45

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Core Funds, and as a result (3) WAMCO's policies failed to reduce favoritism or unfair allocations, and Leech's allocations had the effect of systematically, and illegally, benefitting Macro Opps, Account-1, and Account-2 over the disfavored Core Funds.

162. Similarly, WAMCO told investors in the June 2021 ADV Brochure that "*[i]nvestment allocations are done in a manner that [WAMCO] believes is fair and equitable*," and that "*[a]llocations are developed based on clients with common investment strategies rather than on the particular fee schedules for particular clients*."

163. The statements identified in Paragraph 162 above were materially false and misleading when made because the existence of the cherry-picking scheme at that time meant that allocations were not fair and equitable, but rather explicitly based on driving WAMCO's revenues and increasing Leech's compensation.

164. The June 2021 ADV Brochure touted that it had "oversight mechanisms" in place to prevent trade allocation abuse:

> Third, Western Asset maintains a variety of oversight mechanisms to monitor for situations that might suggest further inquiry would be prudent or that raise potential concerns. From an investment perspective, there are a variety of resources utilized to monitor performance and portfolio management measures such as dispersion and tracking error. Similarly situated accounts are grouped together in Western Asset's systems and data is available to a wide audience beyond a particular portfolio manager. Please see Item 13. "Review of Accounts" for more information about how client accounts are reviewed. ***From a regulatory monitoring perspective, Western Asset maintains a compliance monitoring program which has a component dedicated to reviewing allocations through a variety of means. For example, accounts where Western Asset has a proprietary interest are identified and relevant trades subjected to particular scrutiny. Exception reports produced in the process of performance composite construction are reviewed to identify outliers***.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

165. The statements identified in Paragraph 164 above were materially false and misleading when made because (1) Leech was then engaged in a cherry-picking scheme, (2) Leech violated policies and compliance rules to effectuate the cherry-picking scheme, and (3) while WAMCO may have scrutinized the trades of lower level employees, it turned a blind eye to Leech's systematic violations of Company policy.

166. In the June 2021 ADV Brochure, WAMCO also assured that its "code of ethics" "*is designed to assure that the personal securities transactions, activities and interests of employees will not interfere with the responsibility to make decisions in the best interest of clients*."

167. The statements identified in Paragraph 166 above were materially false and/or misleading when made because by cherry-picking gains for Macro Opps, Account-1, and Account-2 and losses for the Core Funds, Leech was (1) lining his own pocket, (2) artificially supporting "his baby" Macro Opps, and (3) according to CW1, attempting to save his reputation before retirement.

168. In the June 2021 ADV Brochure, WAMCO further attested that there were "no material changes to our brochure since the last [WAMCO] annual update filed in June 2020." WAMCO's attestation of no material changes was false because of the mere existence of the cherry-picking scheme at the time the statement was made.

169. In a document from October 2021 entitled "Western Asset's Statement on Conflicts of Interest," WAMCO assured investors that its "employees must not take advantage of their knowledge or position to place their interests ahead of [WAMCO] clients at any time" and that WAMCO's "compensation structure, covering all employees, is designed to ensure that the interests of [WAMCO's] personnel are aligned with its clients' interests." The Statement on Conflicts of Interest also claimed that WAMCO's compensation structure reduced the

47

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"financial incentive for investment personnel to favor one account for another, or invest in a manner that would disadvantage [WAMCO's] clients."

170.   The statements identified in Paragraph 169 above were materially false and/or misleading when made because Leech was then engaged in a scheme to defraud and he (1) took advantage of his position to violate policy at will by allocating trades to benefit himself, (2) placed his personal interest in Macro Opps, Account-1, and Account-2 over clients' interests in the Core Funds, and (3) his compensation structure was misaligned with WAMCO's clients' interests and thus, Leech was highly incentivized to favor Macro Opps, Account-1 and Account-2 and disadvantage the Core Funds.

171.   WAMCO's Statement of Conflicts of Interest also claimed that the "firm has adopted procedures for allocation of portfolio transactions and investment opportunities across multiple client accounts on a fair and equitable basis."

172.   The statements identified in Paragraph 171 above were materially false and/or misleading when made because Leech was then engaged in a scheme to defraud and he (1) took advantage of his position to violate policy at will by allocating trades to benefit himself, (2) placed his personal interest in Macro Opps, Account-1, and Account-2 over clients' interests in the Core Funds, and (3) his compensation structure was misaligned with WAMCO's clients' interests and thus, Leech was highly incentivized to favor Macro Opps, Account 1 and Account 2 and disadvantage the Core Funds.

173.   On December 15, 2021, WAMCO filed an ADV Brochure with the SEC (the "December 2021 ADV Brochure").   In the December 2021 ADV Brochure, WAMCO attested that "[n]o material changes have been made to this brochure since the last annual update dated June 25, 2021."  WAMCO's attestation of no material changes was false because of the mere existence of the cherry-picking scheme at the time the statement was made.

48

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

174.    The December 2021 ADV Brochure also contained the same false and misleading statements as those set forth in Paragraphs 158, 160, 162, 164, 166, and 168.  These statements were materially false and/or misleading when made for the same reasons set out in Paragraphs 159, 161, 163, 165, 167, and 168.

175.    On December 1, 2022, WAMCO filed an ADV Brochure with the SEC (the "December 2022 ADV Brochure").  In the December 2022 ADV Brochure, WAMCO attested that there were "no material changes since the last update of [WAMCO's] Form ADV, Part 2A brochure dated December 15, 2021." WAMCO's attestation of no material changes was false because of the mere existence of the cherry-picking scheme at the time the statement was made.

176.    The December 2022 ADV Brochure also contained the same false and misleading statements as those set forth in Paragraphs 158, 160, 162, 164, 166, and 168.  These statements were materially false and/or misleading when made for the same reasons set out in Paragraphs 159, 161, 163, 165, 167, and 168.

177.    On June 1, 2023, WAMCO filed another ADV Brochure with the SEC (the "June 2023 ADV Brochure").  In the June 2023 ADV Brochure, WAMCO attested that there were "no material changes since the last update of [WAMCO's] Form ADV, Part 2A brochure dated December 1, 2022."   WAMCO's attestation of no material changes was false because of the mere existence of the cherry-picking scheme at the time the statement was made.

178.    The June 2023 ADV Brochure also contained the same false and misleading statements as those set forth in Paragraphs 158, 160, 162, 164, 166, and 168.  These statements were materially false and/or misleading when made for the same reasons set out in Paragraphs 159, 161, 163, 165, 167, and 168.

179.    On December 1, 2023, WAMCO filed another ADV Brochure with the SEC (the "December 2023 ADV Brochure").  In the December 2023 ADV Brochure, WAMCO attested that there were "no material changes since the last update dated June 1, 2023."   WAMCO's attestation of no material changes was

49

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

false because of WAMCO's failure to disclose the scheme to defraud despite knowing about its existence.

180. The December 2023 ADV Brochure also contained substantively the same false and misleading statements as those set forth in Paragraphs 158, 160, 162, 164, 166, and 168. These statements were materially false and/or misleading when made for the same reasons set out in Paragraphs 159, 161, 163, 165, 167, and 168.

181. Even worse, before these false and misleading statements were made in the December 2023 ADV Brochure, the cherry-picking scheme was discovered internally at WAMCO, Leech's trading and allocation privileges for the Core Funds were removed, WAMCO was then cooperating extensively with the governmental investigations, and had hired outside counsel to conduct an internal investigation and received periodic reports from outside counsel on outside counsel's findings and conclusions.

### E.   ADDITIONAL ALLEGATIONS OF SCIENTER

#### 1.   Cherry-Picking Alone Supports Scienter

182. The existence of the scheme itself is sufficient to show scienter. Leech specifically allocated unprofitable trades disproportionately to the disfavored Core Funds while shifting gains in the same amount to Macro Opps. As CIO, Leech controlled all trading and allocation decisions related to the scheme, and knowingly favored Macro Opps, in which he was personally vested, and disfavored the Core Funds. The existence of the scheme is demonstrated by the Government's evidence in the Criminal Case and the SEC Action, the corroborating CW accounts pled in this Amended Complaint, and the expert reports of Prof. Cohen and Prof. Kolm. *See supra* at Section IV(C)(1) and Section IV(C)(2).

#### 2.   Leech Made False Statements Under Oath

183. On March 6, 2024, Leech testified before the SEC. Leech falsely asserted during his sworn testimony that he made the decision to allocate trades

when he executed them.  Leech has been indicted for making this false statement under oath.

### 3.    Knowing Violations of Corporate Policy Bolster Scienter

184.    In the Criminal Case, the Government intends to introduce evidence to show that WAMCO's internal policies prove that Leech's conduct was wrong. For example, a WAMCO policy on "bunched orders" requires that an "intended allocation algorithm" be provided to the broker before or promptly after a trade is executed.  The Government also has a compliance training video from 2018, in which WAMCO's CCO stressed the importance of allocating trades promptly after execution because regulators examined time stamps and, with respect to delayed allocations, may say "Geez you only allocated after you saw what the market did."

185.    In another compliance training video from 2019, WAMCO's CCO described a "bad fact" scenario strikingly similar to the scheme alleged here and remarked: "I'm sure we never do this, but [regulators have] seen other people in the industry do this and this is one of the things they look at when they come and check out our blotter."

186.    WAMCO's CCO provided similar warnings in emails.  For instance, on August 2, 2021, the CCO again emphasized the importance of prompt allocation and stated: "[m]inimizing the time gap between execution and posting mitigates the risk of market movement before the allocation is finalized.  We do not want a market movement after execution to influence the allocation. . . . We do NOT want a fact pattern that implies that we might trade and then wait to see how the market changes during the day before finalizing our allocation."

187.    According to the SEC Action, in a June 2022 training session, the CCO again described a trader executing a trade at 8:00 a.m. and waiting until noon to allocate as a "bad facts scenario."

188.    The CWs corroborate the evidence uncovered in the Criminal Case, including Leech's knowledge of corporate policy.  According to CW1, WAMCO

51

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

instituted these policies to specifically prevent cherry-picking so employees would not "go to jail." CW2 corroborates that WAMCO held yearly compliance meetings as well as specific training sessions for traders and relationship managers. CW2 further confirmed that Leech and his team knew about WAMCO's allocation policy, but Leech disregarded the policy because it did not "fit" with his working style.

189. Still, CW2 stated that Leech's high position at WAMCO allowed Leech to flout compliance rules, and that it was "not a very well-kept secret" that Leech did not follow the policy, instead preferring to enter his trades later in the day. CW2 knows this because Kevin Brennan, WAMCO's Head of Investment Operations, told CW2 that Leech's allocations were untimely.

190. CW2 also confirmed that WAMCO maintained an electronic compliance log with timestamps for each trade, which would show whether a trade was entered late. Accordingly, WAMCO kept detailed records demonstrating that Leech routinely flouted WAMCO policy and entered trades late in the day.

191. Confidential Witness 7 ("CW7") was a Portfolio Manager in WAMCO's New York office from December 2005 to September 2024. CW7 corroborates that delayed allocations violated WAMCO's policies.

192. According to CW2 and CW7, WAMCO was aware that allocations were being made late and instructed its portfolio managers, including Leech, that the best practice was to allocate trades promptly after execution. WAMCO's compliance department provided mandatory annual training to investment staff, including Leech and other portfolio managers, acknowledging that they knew trades should be allocated promptly after execution. Indeed, it would have been impossible for WAMCO not to have known about the late allocations. It acknowledged the practice was improper, monitored the trading activity, and maintained the systems through which trades were allocated.

52

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

193.   For one of the seven brokers Leech used, Marex, there was a default instruction to allocate Leech's trades to Macro Opps.  However, for the other six brokers Leech used—accounting for approximately 65% of his trading during the Class Period—there were no default allocation instructions, and Leech had full discretion to allocate trades among any of the portfolios he managed across Core, Core Plus, and Macro Opps.

194.   Leech routinely provided his trade assistant with allocations for most of a day's trading activity in a single afternoon phone call at or around 1:00 p.m. Pacific Time (4:00 p.m. Eastern Time, after the settlement price was determined on the Chicago Mercantile Exchange, which sets the daily prices for many of the instruments Leech traded).  CW1 personally observed trades executed in the morning that were not allocated until around 1:00 p.m.  In the hours between when Leech placed trades and when he allocated them, he was able to observe price changes in the relevant instruments using Bloomberg screens displayed on his computer monitors at his home and in his office.

195.   WAMCO also had a double standard.  Other portfolio managers at WAMCO were required to follow the firm's policies and pre-allocate their trades before execution.  If a portfolio manager other than Leech executed a trade without pre-clearance, Trade Operations staff would immediately contact that portfolio manager and require prompt allocation.  Leech, however, was not subjected to the same standard.  CW3—a Pasadena-based Portfolio Manager—corroborates these facts.  CW3 confirms that Leech's position as CIO limited the compliance team's ability to impose discipline.  This experience differed from that of CW3, who would be chased down by WAMCO's compliance team if a trade was not allocated within ten minutes of being made.  This was possible because, according to CW3, WAMCO's compliance team was routinely monitoring trades through the ATP system and auditing trades being made at WAMCO.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

196.   WAMCO's knowing decision to not enforce its allocation policies against Leech created the opening for Leech to injure investors of the Core Funds via the cherry-picking practices that WAMCO's CCO repeatedly acknowledged could be possible without enforcement.

### 4.   Core Operations

197.   At its high point, WAMCO's AUM was $483.5 billion during the Class Period.  Similarly, the Core Funds had $166 billion in AUM.  By June 2024, the AUM for the Core Funds had declined to less than $100 billion.  Following the run on the Core Funds, and upon the disclosures related to the cherry-picking scheme, the AUM for the Core Funds precipitously declined further towards the end of the Class Period.  The size of the Core Funds in relation to WAMCO's total AUM shows that they were central to WAMCO's operations.

198.   Further, even though the AUM for Macro Opps was significantly less than the Core Funds, Macro Opps was considered Leech's "baby," and promoted to clients as reflecting the firm's "best ideas."  WAMCO also told investors that "the firm's overall value opportunities can be assessed through [the Macro Opps] strategy."  Hence, Macro Opps' importance to WAMCO's business is supportive of scienter.

### 5.   Franklin's and WAMCO's Acceptance of Responsibility

199.   In early December 2024, Johnson, Franklin's CEO, attended an investor conference organized by Bloomberg.  At that event, Johnson did not deny that Leech engaged in wrongdoing, and instead threw him under the bus, telling attendees that "it was one person," and "we have made sure that we insulated the investment team from a lot of what's going on with the investigation, so that we can ensure that they're managing clients' money and staying focused on that."  As alleged in Paragraphs 88 and 111, the cherry-picking scheme was first exposed by WAMCO's own employees and well before the Government took any action against Leech.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

200. Franklin and WAMCO also told investors that they were closely cooperating with the Government.  WAMCO placed Leech on leave after he was informed that the SEC recommended the filing of an enforcement action against him.  And, when Leech was indicted on November 25, 2024, Hirschmann and two senior executives wrote to WAMCO's clients to tell them that WAMCO had upgraded its compliance systems in response to the cherry-picking scheme, and was "taking steps to invest in key personnel in our investment team and broader support functions, with an eye toward retention, to ensure continuity of the high-quality service you have come to expect."

201. WAMCO's and Franklin's extensive cooperation with the government following the discovery of the scheme by WAMCO's own employees, and their public statements to investors both show that they never denied either the existence of the cherry-picking scheme or its illegality.

### 6.    Leech's Motive to Commit Fraud

202. WAMCO charged clients management fees based on AUM.  On average, WAMCO charged significantly higher management fees for Macro Opps than for the Core Funds.  The management fee was between approximately 5 and 45 basis points (one basis point equals one hundredth of one percent) of portfolio market value for the Core Funds, with the majority of fees being 30 basis points or less.  The management fee for Macro Opps was between approximately 40 and 115 basis points of portfolio market value, with the majority of fees at 60 basis points or more.

203. WAMCO also collected performance fees for certain Macro Opps strategies managed by Leech that were not charged to the Core Funds.  Because of this difference in fee structures, each dollar of AUM in Macro Opps could generate approximately ***four times as much revenue*** for WAMCO and Franklin as each dollar in Core Funds.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

204.   The financial impact of this differential was substantial.  For example, in 2020, for portfolios managed by Leech: (a) Macro Opps generated approximately $56.6 million in net revenue from approximately $14 billion in AUM; (b) Core earned approximately $26.3 million in net revenue from approximately $21 billion in AUM; and (c) Core Plus earned approximately $65 million in net revenue from approximately $58 billion in AUM.  Thus, despite having less AUM than either Core or Core Plus, Macro Opps generated net revenue comparable to or exceeding that of much larger strategies.

205.   CW4 also confirmed that Macro Opps charged fees that were 6 to 10 times the amount charged by typical fixed-income funds.  CW4 explained that the higher fees that WAMCO charged for Macro Opps compared to its other funds encouraged Macro Opps to take more risk.

206.   WAMCO produced internal scorecards that attributed accounts and net revenue to each portfolio manager.  The scorecards credited Leech with all of the net revenue from Macro Opps, but divided the net revenue from the Core Funds among Leech and several other portfolio managers.

207.  Critically, Leech's personal compensation was directly tied to WAMCO's revenue.  After all of WAMCO's expenses were paid, Leech generally received approximately half of WAMCO's profits in the form of cash incentive compensation.  Between 2018 and 2020, when WAMCO was performing well, Leech's annual incentive compensation ranged from $28 to $30 million per year.  In 2022, as the firm's performance declined, Leech's incentive compensation declined to $21 million.  Leech also received a subset of his incentive compensation in a deferred compensation account invested in WAMCO funds.

208.  The difference in fee structures among the Strategies created a powerful incentive for Leech to maximize the performance of Macro Opps: doing so would generate more revenue for WAMCO, attract and retain investors in the higher-fee strategy, inflate Leech's personal scorecard, and directly increase his

56

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

incentive compensation, which was tied to the firm's profits. In 2023, at the height of the cherry-picking scheme alleged herein, Leech also decreased his personal deferred compensation from the Core Funds from $19.4 million to $143,000 while increasing his deferred compensation in Macro Opps, the very portfolios he favored with better-performing trades, from $142,000 to $19 million.

209.  CW1 also stated that Leech, who was then close to retirement and concerned with leaving WAMCO and Macro Opps in a poor position, wanted to exit the Company without substantial damage to his reputation.

### 7.    Leech's Prior Bad Acts

210.  As early as 2000, Leech repeatedly failed to report trades and to pre-clear personal securities transactions. By 2011, a fellow portfolio manager had independently identified and reported to WAMCO management that Leech was engaging in preferential trade allocations by directing winning trades to favored accounts and losing trades to disfavored accounts. The factual allegations in Paragraphs 211 through 215 are supported by the filings and evidentiary materials submitted in the Criminal Case where the Government has obtained more than 1 million documents comprising over 6.5 million pages in discovery, including contemporaneous emails, business records, electronic trade platform records, historical pricing data, trade blotters, and WAMCO internal documents.

211.  ***History of Delayed Allocations:*** On February 17, 2011, Leech executed a trade in Treasury Inflation-Protected Securities ("TIPS") via an electronic platform at approximately 9:16 a.m. EST. In the same platform, Leech documented the intended allocation for a trading account to fund scholarships. Approximately 12 hours after the trade was executed when the value of the position had increased, Leech emailed his trade assistant and instructed her to reallocate the TIPS trade from the scholarship account to a separate account managed by Leech, which was the same account that primarily benefited from the scheme to defraud during the Class Period.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

212. Other WAMCO employees also witnessed delayed allocations by Leech consistently, even before the Class Period. One such portfolio manager observed that Leech would typically spend approximately one hour on the trading floor in the morning, during which time he would execute trades, and then leave. Leech would then return to the trading floor near market close each day carrying a stack of paper trading tickets, which he delivered to his trading assistant for entry of his end-of-day allocations. This practice was well-known at WAMCO, and became what the portfolio manager described as a "parlor game" among WAMCO personnel because they tried to reconstruct Leech's trading rationale. CW1 confirmed that Leech continued the same practice up to and including October 2023 when CW1 left WAMCO.

213. ***History of Violations of WAMCO Policy:*** On January 14, 2010, Leech asked the compliance department if pre-clearance was required for a trade, and compliance answered yes. Despite knowing that pre-clearance was required, on May 3, 2011, Leech personally invested approximately $8 million in a portfolio without pre-clearance. Leech realized approximately $6 million dollars in personal gains from his investment. A subsequent investigation found that the transaction lacked "all appropriate approvals," and Leech was forced to disgorge approximately $6 million in gains derived from his investment.

214. ***History of Cherry-Picking:*** In or about 2011, Stephen Fulton ("Fulton"), a fellow portfolio manager at WAMCO, told WAMCO executives that Leech orchestrated a cherry-picking scheme. Like the Portfolio Manager and Portfolio Analyst expected to testify for the Government in the Criminal Case, Fulton also analyzed trade blotters and identified specific instances in which winning trades were allocated to favored accounts and losing trades were allocated to disfavored accounts. On October 5, 2011, Fulton sent an email to another WAMCO employee with screenshots documenting specific examples of what

58
AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Fulton believed to be Leech's preferential trade allocations. Fulton then notified WAMCO's then general counsel, Tony Ruys de Perez.

215. ***History of Lack of Compliance:*** Leech has a decades-long history of failing to follow compliance rules, including failing to pre-clear trades, which resulted in his suspension from opening new positions in his personal trading accounts for a period of one month. WAMCO's internal records reflect that Leech was cited for trading and compliance violations in the following years: 2000, 2003, 2004, 2006, 2008, 2009, 2010, 2011, 2013, and 2018.

### 8. Leech's Scienter is Imputed to WAMCO

216. Leech's scienter can be established by the mere existence of the cherry-picking scheme, and it is further bolstered by the many factors identified in Paragraphs 183 through 215. Leech was the principal architect of the cherry-picking scheme and was one of WAMCO's most senior officers. Leech himself claims to be one of WAMCO's most significant executives. In an omnibus pre-trial motion filed in the Criminal Case on August 22, 2025, Leech stated that he joined WAMCO in 1990 when it barely had $5 billion in AUM, and he was "instrumental" in WAMCO's growth into a leading asset manager with over $380 billion in AUM by September 2023. In sworn testimony before the SEC in March 2024, Leech stated that "everyone in the investment department rolls up through the organizational chart and reports to me." According to CW3, everyone in WAMCO's investment team reported to Leech. These facts are more than sufficient to show that Leech was a management-level employee and a direct proxy for WAMCO. Leech's scienter is therefore properly imputed to WAMCO.

### F. LOSS CAUSATION

217. The cherry-picking scheme caused losses and damaged investors.

218. First, Leech and WAMCO effectively deprived the Core Funds' investors of the benefit of the gains that went to Macro Opps, and the avoidance of losses that went to the Core Funds because of the cherry-picking scheme. By

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

shifting over $600 million in net first-day gains to Macro Opps, and over $600 million in net first-day losses to the Core Funds, Leech and WAMCO increased the likelihood of Macro Opps' success and the Core Funds' failure.  The undisclosed scheme to defraud and WAMCO's false statements thus artificially inflated the value of the Core Funds, and when the truth began to emerge, Plaintiffs and the Class lost the difference between the inflated value at the time of their purchase and the true value of the Core Funds in the absence of an active scheme to defraud.

219.   Second, while the scheme remained concealed, the risks nevertheless began to materialize when the NAV of the Core Funds declined from a high of $13.50 for some mutual fund classes to a low of $8.59 for others during the course of the scheme between January 2021 and October 2023.  The NAV began to recover modestly when Leech's trading and allocation privileges for the Core Funds were taken away in October 2023, but never reached the Class Period high again during the rest of the relevant period.  In part, this reflected the diversion of trades with first-day gains to Macro Opps, and the stuffing of trades with first-day losses into the Core Funds, as part of the fraudulent cherry-picking scheme.

220.   Third, Plaintiffs and the Class's losses were substantially caused by a run on the Core Funds that accelerated when the news of the governmental investigations started to come to light.  Combined AUM for the Core Funds went from a Class Period high of over $120 billion to single digits by the time the scheme was exposed in late 2024.  On December 31, 2024, or barely a month after Leech's indictment was unsealed, there were only $3.37 billion in AUM for Core and $7 billion in AUM for Core Plus.  A run on the Core Funds forced the Core Funds to liquidate at disadvantageous prices, thereby reducing the price and value of their underlying securities.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## G.    CONTROL PERSON CLAIMS UNDER SECTION 20(a)

### 1.    Defendant Leech

221.    As WAMCO's CIO, Leech had day-to-day control over all of WAMCO's investments.    As confirmed by CW3, everyone in WAMCO's investment team reported to Leech.    Indeed, on March 6, 2024, Leech testified before the SEC that "everyone in the [i]nvestment [d]epartment . . . rolls up through the organizational chart and reports to me."

222.    Leech led WAMCO's Investment Management Unit, which focused on the management of client portfolios, and exercised discretion and control over WAMCO's clients' assets.    Leech chaired WAMCO's Global Strategy Committee, headed the U.S. Broad Strategy Committee, and served as a member of the firm's Management, Asset Allocation, Global Credit, Mortgage Strategy, and Inflation committees.    He participated in weekly meetings held by each of these committees, and daily strategy meetings at which the Core, Core Plus, and Macro Opps investment teams discussed and evaluated investment opportunities.    Leech advised on strategy and investment decisions for over 30 portfolios comprised of a broad cross-section of securities and other assets from the U.S. and global markets. Further, Leech was a member of WAMCO's risk committee.    CW5 confirmed that the risk committee routinely reviewed scatter charts for each WAMCO fund's strategy.

223.    Leech was also the lead portfolio manager for Macro Opps, and formed the Macro Opps strategy in 2012.    As lead portfolio manager for Macro Opps, Leech was responsible for both the development of Macro Opps' investment strategy and day-to-day oversight over Macro Opps' investments.    According to CW4, Macro Opps was known as "Leech's baby."

224.    Critically, WAMCO's Brochures specifically named Leech as a "person that, directly or indirectly, controls" WAMCO.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

225. Leech is thus a control person of WAMCO both because he is a primary violator of Section 10(b) and a person with authority to exercise control over WAMCO pursuant to Section 20(a). *See infra* at Paragraphs 278 through 282.

### 2. Defendant Hirschmann

226. Hirschmann, as CEO of WAMCO, also had day-to-day control over WAMCO's operations. As CEO, Hirschmann was responsible for the firm's organizational structure, compliance, and the supervision of senior investment professionals, including Leech.

227. Moreover, Hirschmann had access to information about Leech's trading, through WAMCO's ATP system, as well as by nature of being the ultimate decisionmaker at WAMCO. According to CW4, when Bellows had concerns about Leech's trading strategy, he brought those concerns to Hirschmann, along with Leech and Buchanan, and it was ultimately Hirschmann who made the decision to disregard Bellows' concerns. Thus, Hirschmann not only had access to and did receive information about Leech's suspect trading strategy, but was the person who exercised the authority for WAMCO to disregard that information.

228. For all of these reasons, Hirschmann is a control person of WAMCO pursuant to Section 20(a) of the Exchange Act.

### 3. Defendant Franklin

229. Franklin owns 100% of WAMCO. As explained in the Brochures, WAMCO is a subsidiary of Franklin and Franklin "constitutes the ultimate principal owner of [WAMCO]." WAMCO also shares its revenue with Franklin.

230. Indeed, Franklin speaks of WAMCO as if WAMCO and Franklin are the same entity. For example, in its Annual Report filed on Form 10-K with the SEC on November 14, 2022, Franklin stated that any reference to WAMCO was a reference to Franklin and that WAMCO was one of its key brands:

> ***Franklin Resources, Inc. ("Franklin") is a holding company with subsidiaries operating under our Franklin Templeton® and/or***

62

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*subsidiary brand names.* Franklin's common stock is traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "BEN" and is included in the Standard & Poor's 500 Index. ***In this Annual Report, Franklin and its subsidiaries are collectively referred to as the "Company," and words such as "we," "us," "our" and similar terms refer to the Company. We have one operating segment, investment management and related services.***

***We offer our services and products under our various distinct brand names, including, but not limited to***, Franklin ®, Templeton ®, Legg Mason ®, Alcentra ®, Benefit Street Partners ®, Brandywine Global Investment Management ®, Clarion Partners ®, ClearBridge Investments ®, Fiduciary Trust International™, Franklin Bissett ®, Franklin Mutual Series ®, K2 ®, Lexington Partners ®, Martin Currie ®, O'Shaughnessy ® Asset Management, Royce ® Investment Partners ***and Western Asset Management Company*** ®. Unless otherwise indicated, our "funds" means the funds offered under our various brand names.

231. In WAMCO's Brochure filed on December 21, 2021 with the SEC, WAMCO specifically named Franklin as a control person. Instructions to Form ADV Brochure define "control" as, "[t]he power, directly or indirectly, to direct the management or policies of a person, whether through ownership of securities, by contract, or otherwise."

232. Franklin also repeatedly referred to WAMCO as part of Franklin, as opposed to a separate and independent entity, in communications with investors. On May 4, 2021, in Franklin's Q2 2021 earnings call with investors, Nicholls, Franklin's Executive Vice President and CFO, referred to Franklin and WAMCO as a combined entity, stating:

Yeah. ***We're seeing good demand in fixed income and in equity. And fixed income, our Western just had an absolutely fabulous quarter. And I think that's what drove a lot of the top line on fixed income.*** From an equity standpoint the great news is that with value coming back in the marketplace from a return perspective, we feel that we are quite well balanced in terms of our exposure to value and growth.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

233.   Similarly, on November 1, 2022, during Franklin's Q4 2022 earnings call with investors, Franklin Executive Vice President, Adam B. Spector, confirmed that the Core Funds were Franklin's products:

So we have tremendously attractive fixed income in a range of categories.  Core fixed income core and core plus were obviously under pressure this year.  But what we've seen is that we're able to compete really very effectively at the shorter end of the curve in credit products in multi-sector and global and we're seeing significant wins there. ***Despite the performance, Western Core and Core Plus are some of our absolute biggest growth sales products with healthy pipeline and we're excited for that to continue.***

234.   Franklin also consistently and extensively disseminated false and misleading statements throughout the Class Period.  Franklin's logo appears prominently on WAF's SEC filings, and WAMCO directed investors to Franklin's website where WAF's false and misleading SEC filings were prominently displayed, and the NAV of the Core Funds was regularly reported.

235.   Franklin also considered the devastating outflows of AUM from WAMCO as its own individual loss.  For instance, in Franklin's Annual Report filed with the SEC on Form 10-K on November 12, 2024, Franklin stated that:

On August 21, 2024, the Company and WAM announced developments in ongoing investigations into certain past trading activity at WAM by the SEC and U.S. Department of Justice, after which ***we experienced accelerated net outflows from certain WAM[CO] managed mutual funds.***

236.   In Franklin's Form 10-Q, filed on July 26, 2024, Franklin made clear to investors that it had responsibility when it announced "an internal investigation focusing on certain past trade allocations of treasury derivatives in select WAMCO managed accounts."

237.   Moreover, the revelation of the cherry-picking scheme, and the negative financial impact that followed, directly impacted Franklin and its revenues.  For example, in Franklin's 2024 Annual Report filed with the SEC on

64

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Form 10-K, Franklin recognized a reduction of $48.6 billion in AUM from WAMCO because of the scheme to defraud alleged herein.

238. Similarly, Defendants Nicholls and Johnson confirmed to investors that the fallout from the cherry-picking scheme directly impacted Franklin and its business. For example, on November 4, 2024, during Franklin's Q4 2024 earnings call, Nicholls told investors that Franklin saw a 13% increase in adjusted operating expenses due, in part, to legal fees connected with WAMCO and the cherry-picking scheme.

239. For all of these reasons, Franklin is a control person of WAMCO pursuant to Section 20(a) of the Exchange Act.

### 4.    Defendant Johnson

240. As CEO of Franklin during the Class Period, Johnson had ultimate supervisory oversight over Franklin's subsidiaries, including WAMCO, which constituted nearly a quarter of Franklin's AUM. Management and performance fees generated by the scheme to defraud alleged herein also flowed directly into Franklin's consolidated financial results, over which Johnson bore ultimate executive responsibility.

241. Johnson repeatedly made statements to investors indicating that she controlled WAMCO. For example, on January 30, 2022, during Franklin's Q1 2022 earnings call with investors, Johnson said that WAMCO was her brand:

> *I mean, first of all, as we mentioned in the quarter the Core Bond portfolio Western had net flows. We continued to see really strong sales on the gross sales for Western products. 89% of the strategy has outperformed -- actually Core Plus and Core ranked second and eight percentage in there against their peers for the quarter. So really good -- I think good recent performance. The pipeline -- over $10 billion of the pipeline is Western.* As we mentioned the $7.5 billion mandate is part of Western but beyond that they're just getting great support. But I – here's what makes us really excited. Many of the institutional players have been a little bit slowed that's why I think we've seen real strength in our institutional money funds and a lot of flows going there,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

both in the last quarter and continuing through January.  As you see institutions waiting to figure out kind of when the rates peaked.  ***But as they've ventured back into this space, we have three phenomenal brands between Franklin, Brandywine, and Western and they just punctuate that.  The Brandywine Global versus Western Core Plus and Franklin Core Plus from their excess returns only correlate 0.12 and 0.17.  So regardless of what type of view people have on fixed income, we've got really, really great brands in that area***

242.   On May 1, 2023, during Franklin's Q2 2023 earnings call, Johnson again described WAMCO as part of Franklin, the organization she had ultimate authority and control over during the Class Period, stating:

Turning now to investment performance.  In this environment, in particular, ***it's encouraging to see that the sound long-term investment thesis of many of our largest strategies are playing out and performance generally improved across all-time periods.***  This quarter, 64%, 63%, 61% and 66% of our strategy composite AUM outperformed their respective benchmarks on a 1, 3, 5 and 10 year basis.  The one year period improved primarily due to certain ClearBridge and Franklin mutual series equity strategies.  ***Additionally, we're seeing improvement in the longer-term performance of Western Assets [ph] US taxable fixed-income strategies.***

243.   Johnson also signed all of Franklin's SEC filings during the Class Period, which discussed WAMCO as part and parcel of Franklin's overall investment business.

244.   For all of these reasons, Johnson was a control person of WAMCO within the meaning of Section 20(a) of the Exchange Act.

**5.      Defendant Nicholls**

245. As CFO and COO of Franklin, Nicholls was responsible for monitoring the financial performance of Franklin's specialist investment managers, including the fee revenue, AUM, and profitability of WAMCO's investment strategies.

246.   Further, like Johnson, Nicholls routinely discussed WAMCO with investors as if WAMCO and Franklin were one.  For instance, on May 5, 2021, during Franklin's Q2 2021 earnings call, Nicholls discussed WAMCO's fixed-income business, stating:

> Yeah. ***We're seeing good demand in fixed income and in equity.  And fixed income, our Western just had an absolutely fabulous quarter.  And I think that's what drove a lot of the top line on fixed income.*** From an equity standpoint the great news is that with value coming back in the marketplace from a return perspective, we feel that we are quite well balanced in terms of our exposure to value and growth.

247.   Nicholls also signed all of Franklin's SEC filings during the Class Period, which discussed WAMCO as part and parcel of Franklin's overall investment business.

248.   For all of these reasons, Nicholls is a control person of WAMCO pursuant to Section 20(a) of the Exchange Act.

## H.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

249.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all persons and entities other than Defendants who purchased or otherwise acquired shares of the Core Funds' mutual fund classes between January 1, 2021 and November 25, 2024, both dates inclusive, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. Excluded from the Class are Defendants, former and current officers, senior managers, and directors of WAMCO or Franklin, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

250.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, shares of the Core Funds were actively traded.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by WAMCO, WAF, or Franklin and its subsidiaries, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

251.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

252.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

253.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants as alleged herein;
- whether statements made by Leech and WAMCO to the investing public during the Class Period misrepresented material facts about the business, operations, and management of WAMCO;
- whether Leech and WAMCO issued false and misleading statements during the Class Period;
- whether Leech and WAMCO acted knowingly or recklessly in issuing false and misleading statements;
- whether Leech and WAMCO employed devices and artifices to defraud, and carried out a plan, scheme, and course of conduct

which was intended to, and did deceive the investing public, including Plaintiffs and other Class members;

- whether Leech, Hirschmann, Franklin, Johnson, and Nicholls were control persons of WAMCO;
- whether the value of the Core Funds during the Class Period was artificially inflated and/or harmed because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

254.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

255.   While each Class member here relied directly on the value of the Core Funds, which was directly impacted by the scheme to defraud, Plaintiffs will also rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Leech and WAMCO made and disseminated public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- the Core Funds are traded in an efficient market;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Core Funds; and
- Plaintiffs and members of the Class purchased, acquired and/or sold shares of the Core Funds between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

256.   Based upon the foregoing, Plaintiffs and the other members of the Class are entitled to a presumption of reliance upon the integrity of the market.

69

257. Alternatively, Plaintiffs and the other members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the claims alleged herein sound primarily in omission of material information rather than affirmative misrepresentation.

## COUNT I
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against Defendants Leech and WAMCO)**

258. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

259. During the Class Period, Leech and WAMCO employed devices and artifices to defraud, and carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (b) caused Plaintiffs and the other members of the Class to purchase the mutual fund classes of the Core Funds at an artificially inflated value. In furtherance of this unlawful scheme, plan and course of conduct, Leech and WAMCO made the misleading statements alleged in Paragraphs 158 through 180, and engaged in additional unlawful acts as alleged herein.

260. Leech and WAMCO, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to cherry-pick favorable trades for Macro Opps at the expense of the Core Funds.

261. Specifically, Leech and WAMCO employed the following devices, schemes and artifices to defraud the Core Funds' investors and engaged in the following acts, practices and illegal course of conduct:

70
AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- Leech managed investment strategies and participated in strategy meetings, allowing him to exert control over the Core Funds and Macro Opps;

- To effectuate the scheme, Leech placed trades via trading slips and phone calls, often in large batches using an omnibus account, and purposefully avoided placing trades electronically via WAMCO's ATP system;

- Leech strategically delayed allocations in violation of WAMCO's express policy, and instead waited until he learned about the performance of trades to allocate them;

- After observing the performance of his trades for several hours, Leech then strategically allocated better-performing trades to Macro Opps and worse-performing trades to the Core Funds;

- Leech and WAMCO communicated with investors in person, via telephone and email, and via WAMCO's website to entice them to invest in the disfavored Core Funds;

- WAMCO made false and misleading statements about preventing favoritism and unfair allocation of investments;

- WAMCO disseminated WAF's false and misleading statements related to the cherry-picking scheme throughout the Class Period;

- WAMCO knowingly turned a blind eye to Leech's failure to follow WAMCO's trading and compliance policies; and

- Leech reduced his deferred compensation from the Core Funds and reallocated that money into Macro Opps, so that he could further profit from his cherry-picking scheme.

262. As a result of this fraudulent scheme and failure to disclose material facts, the value of the mutual fund classes of the Core Funds was artificially inflated during the Class Period and/or harmed by the cherry-picking scheme.

263. In ignorance of the fact that the value of the mutual fund classes of the Core Funds were artificially inflated and/or harmed by the scheme, Plaintiffs and

71

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the other members of the Class acquired securities during the Class Period at artificially high values, and paid artificially high fees to WAMCO, and were damaged thereby.

264. At the time Leech and WAMCO orchestrated this fraudulent scheme, Plaintiffs and other members of the Class were ignorant of its nature or existence. Had Plaintiffs and the other members of the Class known the truth about this unlawful scheme, they would not have purchased or otherwise acquired the securities of the Core Funds, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated values at which they did, and would not have paid WAMCO artificially high fees for their investments in the Core Funds.

265. As a direct and proximate result of the fraudulent scheme and misconduct alleged herein, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the mutual fund classes of the Core Funds during the Class Period.

266. By virtue of the foregoing, Leech and WAMCO thus violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and the Class members who have been damaged as a result of such violations.

### COUNT II
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Defendants Leech and WAMCO)**

267. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

268. This Count is asserted against WAMCO and Leech and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

72

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

269. During the Class Period, WAMCO made material misstatements to investors as alleged above in Paragraphs 158 through 180. WAMCO also omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

270. Such misrepresentations were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the value of the Core Funds and/or otherwise harm them during the course of the scheme; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire the mutual fund classes of the Core Funds at artificially inflated values and pay artificially high fees to WAMCO.

271. WAMCO and Leech participated directly or indirectly in the preparation and/or issuance of the Brochures and WAMCO's Statement on Conflicts of Interest, which was designed to influence the market for the mutual fund classes of the Core Funds. These documents were false and misleading for the reasons identified in Paragraphs 159, 161, 163, 165, 167, 168, 170, 172, 174, 176, 178, 180 and 181.

272. WAMCO and Leech either had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, they acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them.

273. Information showing that WAMCO and Leech acted knowingly or with reckless disregard for the truth is peculiarly within their own knowledge and control.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

274. WAMCO and Leech are thus liable both directly and indirectly for the wrongs complained of herein. Because of Leech's control and authority, Leech was able to and did, directly or indirectly, control the content of WAMCO's statements. As a registered investment advisor, WAMCO had a duty to disseminate timely, accurate, and truthful information with respect to its business, operations, and financial condition. As a result of the dissemination of the aforementioned false and misleading statements, the value of the mutual fund classes of the Core Funds was artificially inflated or otherwise harmed throughout the Class Period. In ignorance of the adverse facts concerning the long-running cherry-picking scheme, Plaintiffs and the other members of the Class purchased or otherwise acquired securities at artificially inflated values and relied upon the value of the securities, the integrity of the market for the securities and/or upon statements made or disseminated by Leech and WAMCO, and were damaged thereby.

275. During the Class Period, Plaintiffs and the other members of the Class, relied on the materially false and misleading statements described herein both directly and indirectly. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated values that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of the mutual fund classes of the Core Funds was substantially lower than the value paid by Plaintiffs and the other members of the Class. The value of the mutual fund classes of the Core Funds declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

276. By reason of the conduct alleged herein, WAMCO and Leech knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

277. As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

connection with their respective purchases, acquisitions, and sales of securities during the Class Period, upon the disclosure that WAMCO made and disseminated false and misleading statements.

## COUNT III
### (Violations of Section 20(a) of the Exchange Act Against Defendants Leech, Hirschmann, Franklin, Johnson, and Nicholls)

278.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

279.   During the Class Period, Defendants Leech, Hirschmann, Franklin, Johnson, and Nicholls participated in the operation, management and day-to-day control of WAMCO.  Control pursuant to Section 20(a) is supported by: (i) Leech's direct liability under Section 10(b) as well as his high-level role as CIO and portfolio manager of Macro Opps and the Core Funds; (ii) Hirschmann's high-level position as CEO of WAMCO and supervisor of Leech; (iii) Franklin's 100% ownership of WAMCO; (iv) Johnson's high-level position as Franklin's CEO; (v) Nicholls' high-level position as Franklin's CFO and COO; and (vi) Leech's, Hirschmann's, Franklin's, Johnson's, and Nicholls' participation in, and/or awareness of, WAMCO's operations and/or intimate knowledge of WAMCO's actual performance.  Additional allegations of how these defendants exercised control are pled above in Paragraphs 221 through 248.

280.   Leech, Hirschmann, Franklin, Johnson, and Nicholls had the power to influence and control and did influence and control, directly or indirectly, WAMCO's decision-making, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading, and the fraudulent device, scheme, artifice, act, practice, or course of business described in this Amended Complaint.  Franklin, Johnson, and Nicholls were provided with, or had unlimited access to, copies of WAMCO's statements, including each WAMCO Brochure alleged by Plaintiff to be misleading prior to and/or shortly after these

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Leech, Hirschmann, Franklin, Johnson, and Nicholls also had the ability to prevent the fraudulent device, scheme, artifice, act, practice, or course of business described in this Amended Complaint from occurring.  Therefore, each conducted and participated, directly and indirectly, in the conduct of WAMCO's business affairs.

281.   Leech, Hirschmann, Franklin, Johnson, and Nicholls also exercised control over the general operations of WAMCO and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

282.   Because of the above conduct, Leech, Hirschmann, Franklin, Johnson, and Nicholls are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

Plaintiffs hereby demand a trial by jury.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Dated:  March 16, 2026

Respectfully submitted,

By:   *Omar Jafri*

Omar Jafri (*pro hac vice*)
Christopher P.T. Tourek (*pro hac vice*)
Genc Arifi (*pro hac vice*)
**POMERANTZ LLP**
10 S. LaSalle St., Suite 3505
Chicago, IL 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
ojafri@pomlaw.com
ctourek@pomlaw.com
garifi@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Tel: (310) 405-7190
jpafiti@pomlaw.com

Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
jalieberman@pomlaw.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

and

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Jacob Lieberman (*pro hac vice*)
156 South Main Street
Colchester, CT 06415
Tel: (816) 404-7770
Fax: (816) 537-4432

77

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

jlieberman@scott-scott.com

Jeffrey P. Jacobson (*pro hac vice*)
230 Park Avenue, 24th Floor
New York, NY 10169
Tel: (212) 223-6444
Fax: (212) 223-6334
jjacobson@scott-scott.com

*Additional Counsel for Additional Plaintiff*
*The Western PA Electrical Employees*
*Insurance Trust Fund*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS